[616 NYS2d 598]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v TIMOTHY RUTTER, Appellant.

First Department, September 22, 1994

## APPEARANCES OF COUNSEL

*Matthew J. Smith* and *Jeffrey A. Hoerter* of counsel *(Robert T. Johnson,* District Attorney of Bronx County, attorney), for respondent.

*Robert L. Adams* of counsel *(Hiscock & Barclay,* attorneys), for appellant.

### OPINION OF THE COURT

MURPHY, P. J.

The within application for a writ of error coram nobis presents a claim of ineffective assistance of appellate counsel *(see, People v Bachert,* 69 NY2d 593).

Following a jury trial in Bronx County, petitioner, Timothy Rutter, was convicted by judgment rendered March 26, 1982, of murder in the second degree and sentenced to a prison term of 25 years to life. The judgment of conviction was affirmed by this Court, without opinion, by order entered February 2, 1984 (99 AD2d 933, *lv denied* 62 NY2d 653).

The evidence at trial credited by the jury, established that on July 17, 1980 the petitioner along with William Bowen, Bowen's then 18-year-old girlfriend, Tina Swane, and the victim, Matthew Whitworth, travelled from Philadelphia to

New York City in Whitworth's car. Swane, whose testimony constituted the only direct evidence of petitioner's involvement in the crime, stated that on reaching the Hunt's Point section of the Bronx on the morning of July 18, 1980 petitioner, who had a knife and had threatened to do "something real bad" to Whitworth, stabbed Whitworth while Whitworth was sitting in the front passenger seat of the car. A struggle ensued outside of the car during which petitioner continued to stab Whitworth while Bowen struck him with a jack handle.

Swane, a substance abuser with an extensive psychiatric history who had worked as a prostitute since the age of 16, acknowledged on cross-examination that she had made numerous statements inconsistent with the account of the crime given in her direct testimony. She admitted telling the Philadelphia police on September 18, 1980 and the Denver, Colorado, police on February 5, 1981 that she had not seen the murder, and admitted that she had informed both the New York police and Grand Jury that Bowen had not participated in the crime. Indeed, up until two weeks before trial, Swane maintained in statements made to the Assistant District Attorney handling the Bronx prosecution of petitioner and Bowen that she had not witnessed Whitworth's demise. The petitioner's strategy was, accordingly, to attempt to discredit Swane's trial account of the homicide by raising questions as to her over-all credibility and specifically as to the truthfulness of her relatively recent claim that she had been present during the crime and had observed Whitworth being slain. Swane's testimony as to how the crime occurred was, however, bolstered by the receipt in evidence, over the defendant's objection, of a piece of bloodstained carpet removed from the Whitworth vehicle. The carpet fragment had been recovered from the vehicle by a Philadelphia police officer who testified that while examining the inside of the car on September 26, 1980, more than two months after the crime, he discovered what was subsequently ascertained to be a human bloodstain on a portion of the car carpet adjacent to the front passenger seat, the area in which Swane had testified that petitioner had commenced knifing the victim. The officer, however, also acknowledged that the Whitworth vehicle had been inspected by the Philadelphia police in August of 1980 at which time no bloodstains were found[1] and that in the time intervening

---

1. The victim's mother also testified that when she viewed the car, shortly after its return from New York, she did not notice any bloodstains.

between that search and the subsequent September 26, 1980 inspection, the car had been used by the victim's stepfather and had been involved in an accident. Indeed, the September 26, 1980 inspection took place while the vehicle sat awaiting repairs in an autobody shop. It was, moreover, never determined what type of blood had produced the carpet stain, much less whether the blood was of the same type as the victim's.

The morning after Swane was excused from the witness stand, the prosecution disclosed that it had just come into possession of the transcript of a polygraph interview conducted by the Philadelphia police on September 18, 1980 in which Swane denied any knowledge of the Whitworth homicide. The relevant portion of the transcript reads as follows:

"QUESTION: Do you know for sure who murdered Matthew?

"ANSWER: No.

"QUESTION: Did you see Matthew murdered?

"ANSWER: No.

"QUESTION: Right now can you take me to the weapon used to murder Matthew?

"ANSWER: No.

"QUESTION: What can you tell me about the murder of Matthew Whitworth?

"ANSWER: Nothing.

"QUESTION: What can you tell me about the last time you saw Matthew?

"ANSWER: He was alive.

"QUESTION: Where was that?

"ANSWER: In his car in front of a club in the Bronx, New York City, Tim and Akia [the name Swane used to refer to Bowen] were in a car with him. They left and were gone about five hours, and just Tim and Akia came back and said Matthew had gotten in a car with his cousin."

Defendant's counsel requested that Swane be returned to the witness stand so that she could be cross-examined with the newly disclosed material. The request was, however, denied, the trial court stating simply, "Ms. Swane is not being recalled. She was on the stand yesterday morning, from early yesterday morning until four o'clock". Although effectively precluding use of the statement for cross-examination, the Court did permit the transcript of the polygraph interview to be read into the record.

On appeal, petitioner's assigned appellate counsel briefed three points the headings of which follow verbatim:

"1. Could the defendant Rutter be convicted of murder if the main testimony was based solely on conflicting, perjurious statements from a 19 year old admitted paranoid prostitute and drug addict?"

"2. Was the judge in error in not immediately granting defendant's motion for a mistrial when evidence was introduced by the district attorney's questioning alluding to an uncharged crime committed by the defendant?"

"3. As a matter of law, Tina Swane should have been considered an accomplice and it was plain error for the court not to have given the jury an accomplice witness charge considering the weight of her testimony."

The entire argument of these three points raised on behalf of a defendant convicted of murder and sentenced to a term of 25 years to life, was five pages in length. Sadly, brevity was not in this instance indicative of some remarkably concise appellate mastery of fact and law. The 30-line argument made under point 1 of the appellate brief, purporting to challenge the sufficiency of the evidence, rested upon the utterly meritless contention which, moreover, was never raised at trial, that Tina Swane did not possess the capacity to testify (see, CPL 60.20), and upon the similarly unpreserved and equally meritless contention that Swane was an accomplice whose uncorroborated testimony could not support a conviction (see, CPL 60.22). While there were numerous reasons to question Swane's credibility, none of which were elaborated upon in point 1, it ought to have been plain to appellate counsel as it apparently was to trial counsel that incredible as Swane may have seemed she did not lack basic testimonial capacity within the meaning of CPL 60.20.[2]

The argument that Swane's testimony required corroboration in order to suffice as the basis for petitioner's conviction and the related argument made by appellate counsel under point 3 that the jury should have been charged that Swane was an accomplice as a matter of law, were not only unpreserved, no request for an accomplice corroboration charge having been made at trial, but betrayed a complete misunder-

---

2. CPL 60.20, provides in relevant part "1. Any person may be a witness in a criminal proceeding unless the court finds that, by reason of infancy or mental disease or defect, he does not possess sufficient intelligence or capacity to justify the reception of his evidence."

standing of the defendant's hardly veiled trial strategy which, as noted, was to raise a question as to whether Swane had in fact witnessed the crime—a most natural, if not inevitable, strategy in light of Swane's numerous pretrial statements to the effect that she knew nothing about the crime's commission. Indeed, given the considerable efforts of trial counsel to convince the jury that Swane had not witnessed the crime, it would have been a remarkable about-face at cross purposes with all that the defense had done before for counsel to have argued at the conclusion of the trial that Swane had not only witnessed the crime, but participated in it and that the jury should be so charged. Of course, no such argument was made. Nevertheless, as noted, appellate counsel saw fit to premise two of his three appellate arguments, either in significant part or exclusively, upon the contention that Swane had in fact taken part in the crime and should have been deemed an accomplice as a matter of law. Nowhere in his brief did counsel even begin to explain why the claim of Swane's complicity, never made at trial for the very good reason that it entailed a view of the facts fundamentally at variance with that which the defense wished to promote, should have been broached much less judicially considered for the first time on appeal.

Of the errors assigned by counsel on appeal, it was in fact only that respecting the court's failure to declare a mistrial (point 2, *supra)* which was preserved by objection at trial. What should have been a relatively straightforward argument to the effect that the prejudice to the defendant from the disclosure of an uncharged offense similar to the one for which he was being tried was sufficient to require that the trial be aborted, was, however, hopelessly confused and at points significantly at variance with the record. Although, given the nature of the offense charged, a passable, even if not winning, argument might have been made that petitioner had been irreparably prejudiced by the prosecutor's elicitation from Swane's testimony in which she stated that she had heard that "he [petitioner] went back to Philadelphia and stabbed somebody else",[3] appellate counsel initially and unaccountably advanced as the predicate for the claim of prejudice the very much more mild circumstance that petitioner had

---

3. Militating against a reversal on the basis of this disclosure was the trial court's immediate and strong curative instruction and the circumstance that the disclosure had apparently not been deliberately elicited.

been arrested in possession of a gun.[4] Having completely confounded the basis for the mistrial motion, counsel managed in the 1½ pages of remaining "argument" to ramble on about matters which, for the most part, had little or no relevance to whether the motion ought to have been granted. And, although counsel, by the time he reached the second and last paragraph of his argument, apparently did realize that the argument properly related to the disclosure of the uncharged stabbing (but apparently saw no reason to emend his initial paragraph accordingly), and made the one sentence contention that "[T]he stabbing of another person in another city which comes to the attention of the jury creates a prejudicial atmosphere effectively depriving the defendant of a fair trial", that single relevant, if poorly put, sentence, was all but lost among the numerous and occasionally remarkable irrelevancies which followed, among them that the trial court's reservation upon the mistrial motion created a situation in which "the jury could reasonably infer that he [petitioner] did not take the stand because he could not answer questions concerning the [Philadelphia] stabbing" and that it had "prevented trial counsel to *[sic]* decide whether or not to put the defendant on the stand". Counsel's preoccupation with the effects supposedly stemming from the court's reservation upon the motion missed the point completely. The only issue was whether the mistrial was properly denied; if it was, there could have been no prejudice to the defendant from the circumstance that the denial came at the conclusion of the trial, and if it was not, reversal would by hypothesis have been required by reason of the improper disclosure itself; the course of the trial subsequent to the disclosure could not have possessed relevance to the determination of the pertinent appellate claim which was, after all, that the disclosure of the uncharged stabbing warranted the *immediate* termination of the trial. In any event, notwithstanding counsel's view that it would have been "reasonable" for the jury to draw an adverse inference from the defendant's failure to testify in response to the disclosure of the uncharged stabbing, it is elementary that the jury was not permitted to draw such an inference. Counsel's additional contention that the manner in which the mistrial motion was disposed of in some way compromised petitioner's right to

---

4. If it was in fact disclosed at trial that petitioner had been arrested in possession of a gun, there is no mention of such disclosure in the factual portion of the appellate brief or, for that matter, in the Appendix accompanying the present motion.

testify in his own behalf was also patently baseless, trial counsel having stated at the time of the motion "[T]his defendant is not even testifying, at least up until this point, and does not plan to testify in this case." While the disclosure of the uncharged crime may have been prejudicial to petitioner by reason of the nature of the information disclosed, there was no viable argument that the court's refusal to rule immediately upon the mistrial motion had any impact at all on the petitioner's decision as to whether he would testify, his decision not to testify apparently having been made long before for reasons which could have had nothing to do with the subsequent disclosure of the uncharged stabbing.

Standing in sharp contrast to the useless, confused and for the most part unpreserved arguments which were made by appellate counsel were those arguments inexplicably left unmade. Indeed, the record of the defendant's trial was not one from which the extraction of meritorious appellate points required marked perspicacity or ingenuity. Several issues, fully preserved for review with appropriate objections,[5] practically screamed for appellate attention. The first of these, of course, related to the timing of the prosecution's release of the polygraph transcript.

It is clear that the polygraph transcript, containing as it did exculpatory declarations made to the police by the prosecution's principal witness, was both *Rosario* and *Brady* material and, as such, should have been turned over to the defendant, at the commencement of the trial (CPL 240.45 [1] [a]), or, at the very latest, prior to cross-examination *(People v Rosario,* 9 NY2d 286, 289; *People v Ranghelle,* 69 NY2d 56, 62). The People, of course, do not, and indeed, cannot, dispute that Swane's responses during the polygraph session were exculpatory; it is rather their position that their *Rosario/Brady* obligations were somehow excused since they were not apprised by the Philadelphia Police Department of the transcript's existence until midtrial. The Court of Appeals has,

---

5. While the People in responding to the present motion represent that the issues regarding the timing of their disclosure of the polygraph were waived by the agreement of trial counsel that the text of the polygraph transcript be read into the record, it is clear that trial counsel only agreed to this course after the court in response to counsel's applications to return Swane to the stand had repeatedly made its inalterable opposition to the recall of Swane clear. Counsel's acquiescence in the procedure practically dictated by the court, cannot be termed a waiver of the very substantial issues raised by the timing of the People's disclosure and the court's refusal to permit any further cross-examination of Swane.

however, held that "society's interest in maintaining criminal trials as truth-finding processes requires that the burden of locating and producing prior statements of complaining witnesses, filed with police agencies, remain solely with the People" *(People v Ranghelle, supra,* at 64), and it is clear that this burden was not met by the People in connection with petitioner's trial. The New York and Philadelphia law enforcement authorities cooperated closely in investigating the Whitworth homicide and preparing the case against petitioner and Bowen for trial. Plainly, the Philadelphia police files were made available to the Bronx prosecutor who did not hesitate to make use of anything in the files favorable to his case. Having been afforded unfettered access to the documents generated in the course of the police investigation, the prosecutor was not free simply to take what he found useful from them and consign the rest to oblivion; he had an obligation commensurate with his access to and control over the subject police generated materials to ensure the fairness of the ensuing trial by locating and turning over to the defense any nonconfidential statements of prosecution witnesses recorded in those materials relevant to the testimony that those witnesses would be called upon to give, and particularly any such statements possessing exculpatory significance.

Indeed, although respondent now makes much of its alleged lack of control over the polygraph transcript, there was no claim at trial that the prosecutor's disclosure obligation vis-à-vis the transcript was excused for that reason. The trial assistant's contention was rather that there had been an innocent mistake; that although the detective in charge of the investigation had "indicated to [him, the trial assistant,] that [he] had all the Philadelphia police reports", that turned out not to be the case. But it avails the People little to characterize their delay in releasing the transcript as unintended, for as the Court of Appeals has repeatedly held, "the People's good-faith effort to locate, identify and discover all *Rosario* material does not excuse their failure to produce covered material" *(People v Ranghelle,* 69 NY2d 56, 63, *supra; see also, People v Novoa,* 70 NY2d 490, 499). The rule, of course, is no different in the *Brady* context where it has been observed that "[n]egligent, as well as deliberate, nondisclosure may deny due process. Good faith, therefore, may not excuse even a negligent failure to disclose unrequested exculpatory evidence where that evidence is highly material to the defense" *(People v Simmons,* 36 NY2d 126, 132).

It is, of course, relevant in assessing the legal consequence of the People's failure strictly to abide by their disclosure obligations under *Rosario* and *Brady* that the polygraph transcript was turned over to the defense before the trial had concluded; given the circumstance that the transcript was released at a time when it still might have been useful to the defendant the fact that the disclosure was late would not of itself have required reversal of the conviction. The utility of the disclosure, however, was largely if not wholly dependent upon the renewed cross-examination of Swane, the oft-stated purpose of the *Rosario* rule being "to ensure that a defendant 'receives the full benefit of a [prosecution] witness' statements for impeachment purposes' " *(People v Ranghelle,* 69 NY2d 56, 62, *supra,* citing *People v Poole,* 48 NY2d 144, 149; *see also, People v Perez,* 65 NY2d 154, 159; *Matter of Kelvin D.,* 40 NY2d 895, 896). But petitioner's application to recall Swane was denied, rendering the final consequence of the People's delay in disclosing the polygraph interview transcript the complete foreclosure of any benefit petitioner might have gained from using the subject statements in Swane's cross-examination. The ends sought to be ensured by *Rosario* were, then, wholly frustrated. Indeed, the People's failure to disclose the prior inconsistent statements of their principal witness until such time as those statements could no longer be used by defense counsel for impeachment was the practical equivalent of a complete default in the discharge of their *Rosario* obligations and, had the issue been raised on appeal, would certainly have required reversal of the petitioner's conviction: a complete failure to disclose *Rosario* material, of course, constitutes per se grounds for reversal *(People v Consolazio,* 40 NY2d 446, 454), and where, as here, there has been a delay in disclosure with similarly preclusive consequences reversal without regard to prejudice is no less required *(see, People v Banch,* 80 NY2d 610, 617).

Reversal would have been mandated as well had the People's delay in disclosing the polygraph transcript been litigated on appeal as a *Brady* violation, which it doubtless was. The exculpatory material at issue was specifically requested by trial counsel and, that being the case, the failure of the prosecutor to turn it over in time for use in Swane's cross-examination was inexcusable. The cases in this State have consistently held that where specifically requested exculpatory material in the possession or control of the prosecutor is not timely disclosed, there must be a reversal if there is any

reasonable possibility that the failure to avail the defense the use of the material contributed to the verdict *(see, People v Vilardi,* 76 NY2d 67, 76, and cases cited therein). Plainly, it would not be possible to say or, indeed, to have said, that there was no reasonable possibility that timely disclosure of Swane's polygraph interview statements would have led to a verdict more favorable to the petitioner. The statements, after all, flatly contradicted Swane's crucial, and from the prosecution's standpoint, indispensible, testimony inculpating petitioner. Indeed, even if there had been no specific request for the polygraph transcript, its materiality to petitioner's defense ought to have been self-evident: the case against petitioner, resting as it did almost entirely on Swane's very questionable testimony, was hardly overwhelming, and in that already dubious evidentiary context the polygraph transcript would have been sufficient, particularly had counsel been permitted to realize its considerable impeachment value, to create a reasonable doubt as to petitioner's guilt. As the Supreme Court has observed with regard to assessing materiality in the *Brady* context, "[i]f there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt" *(United States v Agurs,* 427 US 97, 112-113). As the verdict in petitioner's case was already questionable and the additional evidence, the polygraph transcript, was far from minor in import, there can be no doubt that the transcript was in fact material and that it should have been timely disclosed regardless of whether there had been a specific request. Accordingly, the failure of the People to make the required disclosure constituted a denial of due process which would have fully warranted reversal of petitioner's conviction *(supra)*.

It should be stressed that the strength of petitioner's *Rosario* and *Brady* claims would not have been diminished by reason of the fact that the trial court permitted the above-cited portion of the polygraph transcript to be read into the record. The point of disclosure pursuant to either rule is not simply or even necessarily that evidence be placed before the fact finder; it is rather to facilitate the defendant's presentation through counsel of an effective defense, which is to say a defense in which counsel at least has the option of cross-examining prosecution witnesses with prior inconsistent and

exculpatory statements. When that option is foreclosed by late disclosure and the defendant is thus deprived of the opportunity thoroughly to explore weaknesses in the People's proof both the fairness of the trial and the validity of its result are fundamentally called into question. Unfortunately, doubts as to the fairness and probity of a criminal proceeding in which cross-examination of prosecution witnesses upon centrally relevant material has been denied, cannot be allayed by a palliative of the sort effectively prescribed by the court at petitioner's trial. The reading of a prior inconsistent statement into the record is no substitute for vigorous and thorough cross-examination of the declarant, particularly where, as here, the prior statement is not only inconsistent but exculpatory and was made by an individual whose subsequent trial testimony constitutes the principal proof of the defendant's guilt.

Yet another ground upon which petitioner's conviction would have been subject to reversal was the trial court's failure to permit Swane's recall. For even if the People had fulfilled their disclosure obligations and turned over the polygraph transcript as soon as it came within their control, and even if, as they maintain, that did not occur until the day after Swane had been excused from the witness stand, the question would still remain whether the court's summary refusal to grant petitioner's application for Swane's recall for cross-examination upon what at the point of disclosure was incontestably both *Brady* and *Rosario* material, was a legally sustainable exercise of judicial discretion. Plainly, it was not. Fully implicated by petitioner's request to recall Swane, was his basic constitutional right to confront and cross-examine his accuser *(see, Davis v Alaska,* 415 US 308, 315-316) and his due process right to do so with the benefit of exculpatory material disclosed by the prosecution *(Brady v Maryland,* 373 US 83). Implicated as well was petitioner's state statutory (CPL 240.45 [1] [a]) and common-law right to " 'receive[ ] the *full* benefit of a [prosecution] witness' statements for impeachment purposes' " *(People v Ranghelle,* 69 NY2d 56, 62, *supra,* citing *People v Poole,* 48 NY2d 144, 149, *supra* [emphasis added]; *see also, People v Perez,* 65 NY2d 154, 159, *supra; Matter of Kelvin D.,* 40 NY2d 895, 896, *supra).* The trial court's refusal to permit Swane's recall for renewed cross-examination with the newly disclosed *Brady* and *Rosario* material in a situation where the determination as to the defendant's guilt or innocence may well have hung in the

balance constituted a denial of the defendant's due process right to a fair trial and an affront to what we have in this State held "a right sense of justice" to require *(People v Rosario,* 9 NY2d 286, 289, *supra)*. Had this plainly meritorious argument been made, there seems little room for question that a reversal of petitioner's conviction would have followed.

Also meritorious as an appellate issue and preserved in the trial record but left unaddressed by appellate counsel, was the trial court's determination to admit in evidence the blood-stained carpet fragment. As trial counsel had argued in opposition to the receipt of the evidence, there was no chain of evidentiary custody established furnishing assurance as to the bloodstain's connection with the crime. Those who had examined the Whitworth vehicle in the relatively near aftermath of the crime, including the victim's mother and a detective and technician from the Major Crimes Unit of the Philadelphia Police Department had not found any bloodstains in the vehicle. Indeed, the report from the August 22, 1980 inspection of the vehicle by the Major Crimes Unit stated in relevant part "[T]he below described vehicle was examined & searched by both the assigned technician and Det. Kinsey #954 MCU, in an effort to locate blood stains or any other sign of a violent crime. Search for blood stains were *[sic]* negative". As noted, it was only subsequent to this unsuccessful search of the vehicle for bloodstains and after a period during which the vehicle was used, involved in an accident and sustained damaged that another Philadelphia police officer, at that point more than two months after the crime, detected the ultimately untyped bloodstain on the carpet fragment which came to be received in evidence.

The law is clear that "[t]o be admissible, any piece of real evidence must be shown to accurately portray a relevant and material element of the case. When real evidence is purported to be the actual object associated with a crime, the proof of accuracy has two elements. The offering party must establish, first, that the evidence is identical to that involved in the crime; and, second, that it has not been tampered with" *(People v Julian,* 41 NY2d 340, 342-343). In determining admissibility then, the basic inquiry is whether there are " 'reasonable assurances of the identity and unchanged condition' of the evidence" *(supra,* at 343, citing *Amaro v City of New York,* 40 NY2d 30, 35). Here, while there may have been reasonable assurance that the carpet fragment came from the vehicle of the murder victim, there was no evidence providing

comparable assurance that the condition of the carpet had not been materially altered in the interval between the crime and the September 26, 1980 inspection when the bloodstain was discovered. It is, of course, the rule that "when the evidence itself is not patently identifiable or is capable of being replaced or altered, admissibility generally requires that all those who have handled the item 'identify it and testify to its custody and unchanged condition' " *(People v Connelly,* 35 NY2d 171, 174, citing *People v Sansalone,* 208 Misc 491, 493). However, not only did the People fail to establish an unbroken chain of custody respecting the obviously alterable carpet fragment, the custody of the car and its carpet having been largely indeterminate from the time of the crime until the discovery of the bloodstain, but it is additionally clear that there was substantial evidence supporting the inference that the bloodstain was not present in the relatively near aftermath of the crime. Nor was there countervailing proof providing any reasonable assurance as to the provenance of the bloodstain; as noted, the bloodstain had not even been typed to determine whether it was possible that it had been produced by the victim. Under these circumstances, in which no chain of custody was established and there were no other reasonable assurances that the carpet fragment "accurately portray[ed] a relevant and material element of the case" *(People v Julian, supra,* at 342), the proffered evidence ought not to have been received.

Plainly, the prejudice to petitioner from the erroneous admission of the carpet fragment could not have been deemed negligible. As the trial court observed at sentencing, "[S]tanding alone, Miss Swaine's *[sic]* much unimpeached *[sic]* testimony was hardly overwhelming." That being the case, any additional evidentiary increment tending to make Swane's account of the crime seem more probable could not have been dismissed as superfluous to the jury's verdict of guilt. Accordingly, on this issue as well it is likely that petitioner would have obtained reversal of his conviction, if only appellate counsel had seen fit to make the necessary argument.

While it is doubtless true as respondent reminds us, that "[T]he burden lies with those raising the issue to rebut the presumption that counsel has been effective" *(People v De La Hoz,* 131 AD2d 154, 158), it is equally true that unless the presumption is irrebuttable it has been overcome in this case. At issue on this application is not whether appellate counsel's strategy could with the benefit of hindsight have

been improved;[6] the issue is rather one of basic competence. Here, appellate counsel had before him a trial record in which there were prominently preserved no fewer than four issues upon which reversal of his client's conviction could have been obtained[7] Yet, not one of these issues was even raised, much less argued. Indeed, the brief nowhere so much as mentioned the existence of the polygraph transcript or the timing of its disclosure. It is well settled that the unexplained failure of counsel to raise issues which, if raised, would have rendered a reversal or modification likely, constitutes a sufficient ground upon which to predicate a finding of ineffective assistance of appellate counsel *(People v Rodriguez,* 185 AD2d 198; *see also, People v Decker,* 134 AD2d 726; *People v LeFrois,* 151 AD2d 1046).* That criterium has, unfortunately, been amply satisfied in this case. Given the nature of the unbriefed issues, particularly those relating to the People's disclosure obligations in connection with which the threshold for reversal is very low, it was not merely likely but virtually certain that had the relevant points been raised petitioner's conviction would have been reversed. When there is added to this very basic failure of appellate representation, the evident lack of care and confusion which suffused the briefing of those issues counsel thought appropriate to raise, it becomes apparent that petitioner has not merely presented a sufficient, but an overwhelmingly meritorious claim of ineffective assistance of appellate counsel. This is a case in which counsel's failure to render competent representation palpably diminished the court's capacity to do justice. Indeed, unless the efforts of counsel are to be deemed irrelevant to the quality of our jurisprudence, it would seem to us that the within application must be granted.

Accordingly, the application for a writ of error coram nobis should be granted, the aforesaid order of this Court entered on February 2, 1984 (appeal No. 18804) should be recalled and vacated and the judgment convicting petitioner of murder in

---

6. It should be emphasized that the arguments as to those points upon which petitioner's conviction could have been reversed did not require any prescience by counsel; although some of the cases cited herein were decided after petitioner's appeal, none of those cases broke new ground with respect to the relevant issues; all of the law necessary to the successful argument of the appeal was in existence well before the appeal.

7. These were of course the *Brady* and *Rosario* issues raised by the timing of the disclosure, the due process issue raised by the trial court's denial of the petitioner's request to recall Swane and the evidentiary issue posed by the receipt of the bloodstained carpet in evidence.

the second degree should be reversed and the matter remanded for a new trial *(see, People v Rodriguez,* 185 AD2d 198, *supra).*

SULLIVAN, CARRO and ROSS, JJ., concur.

Writ of error coram nobis granted, the order of this Court entered on February 2, 1984 is hereby recalled and vacated, and the judgment of the Supreme Court, Bronx County, rendered on or about April 29, 1984, unanimously reversed, and the matter remanded for a new trial *(see, People v Rodriguez,* 185 AD2d 198).