OPINION OF THE COURT
Chief Judge Kaye.
In the early morning hours of February 4, 1994, Louis Balancio was murdered outside a bar where Anthony DiSimone and Darin Mazzarella had gathered with friends. At approximately 3:00 a.m. Darin Mazzarella called his brother, Nicholas, asking that he come to his apartment immediately. When Nicholas arrived at the apartment he found Darin, Anthony DiSimone and another mutual friend, Eric Tofty. DiSimone was wearing a sweater, jeans and a leather jacket. Tofty was dressed in a sweatsuit. DiSimone informed his friends that he “did an Albo,” which Nicholas understood to mean that DiSimone had killed an individual of Albanian descent. As the men discussed what to do next, Alfred Santorelli, Darin’s roommate, returned home and was told of the earlier events. Alfred told DiSimone and Tofty to change their clothes because they were covered in blood. The men went into the kitchen to change, and Alfred Santorelli emerged carrying two trash bags, one black and the other dark green, which he took from the apartment.
Later that day, while waiting in a restaurant parking lot to meet a fellow FBI agent, David Calore saw defendant — Alfred Santorelli’s father — drive into the lot, exit his automobile, look around carefully and then discard a brown garbage bag in a nearby trash container. Intrigued by this behavior, Special Agent Calore continued observing defendant as he ate lunch in his car, placed the wrappings in a nearby receptacle, then again *417 carefully looked around the parking lot and placed a second trash bag, this one black, in the same receptacle. Defendant made a call from a payphone and left.
Calore and his FBI friend then collected the trash bags and placed them in Calore’s trunk. On later examination, Calore found a bloodstained leather jacket and sweater in the black bag and a sweatsuit, also stained with fresh blood, in the brown bag. Test results revealed that the blood and DNA found on the clothing were Balancio’s. Additionally, defendant’s fingerprints were found on the outside of both bags, and one of his fingerprints was found inside the brown bag.
Defendant was indicted on four counts of tampering with physical evidence. Before trial, the prosecutor informed him that the People would not call Darin Mazzarella to testify at trial. Consequently, defense counsel acknowledged that the People were not obligated to furnish Rosario material relating to Darin, and limited their inquiry to “Brady /Vilardi material” such as “any information emanating from [Darin] which is inconsistent with the People’s theory of the case or is otherwise favorable to Mr. Santorelli.” After receiving certain Brady material, defense counsel requested “in light of the federal-state nature of the investigation of Nicholas Mazzarella * * * a copy of all FBI 302 [reports] and notes reflecting debriefings of Nicholas Mazzarella concerning persons and incidents related to this case.” Defendant further sought “any other Brady/Giglio material in the People’s custody or control or which, upon exercise of due diligence, can be brought within the People’s custody and control.”
The District Attorney promptly replied:
“On February 23,1998,1 informed [defense counsel] that Assistant United States Attorney Kerry Lawrence of the Southern District of New York, indicated to me that he is attempting to locate the search warrant application done by Special Agent Calore on February 4, 1994. Since that time, Mr. Lawrence has advised me that he has learned that the application is sealed. The United States Attorney’s Office is moving to unseal it so that I can provide it to you. As soon as he furnishes me with it, I will send it to you.
“Further, in response to my inquiry, AUSA Lawrence and Agent Calore have informed me that no *418 written reports were prepared regarding the anticipated [Nicholas] Mazzarella testimony in this matter concerning the Westchester County charges currently pending against your client. Both AUSA Lawrence and Agent Calore have declined to provide me with any reports concerning any debriefings of Nick Mazzarella regarding matters or individuals they have or are investigating.”
Defendant subsequently attempted to subpoena the requested documents directly from the FBI. By letter dated February 27, 1998, the Department of Justice informed defense counsel that, on two grounds, the FBI would resist the subpoena: first, defendant failed to follow proper procedures and second, the requested documents were protected by the Federal Privacy Act and could not be released without “the written consent of the individual(s) involved or an appropriate court order.” Defendant next moved to compel disclosure or, alternatively, to preclude Nicholas and Calore from testifying at trial. In a March 1998 letter to the court responding to defendant’s motion, the Assistant District Attorney agreed to provide defendant with “all reports, notes and statements of [Nicholas] Mazzarella which this Office has in its possession or control.” The prosecutor further informed the Trial Judge that:
“as previously stated in my February 24, 1998 letter to defense counsel, Assistant United States Attorney Kerry Lawrence and FBI Special Agent David Calore previously have informed me that they have no written report [s] which contain statements by Nicholas Mazzarella concerning the events of February 4, 1994. AUSA Lawrence and Special Agent Calore, on March 6, 1998 and March 9, 1998 respectively, confirmed this representation and further stated that there also are no notes reflecting any such statements.
“To the extent the defense is seeking reports and notes reflecting debriefings of Nicholas Mazzarella beyond the events of February 4, 1994, but concerning persons and incidents allegedly relating to this case, even the District Attorney’s Office has been denied access by the federal government to such reports, assuming they exist. Contrary to the defendant’s assertion, the FBI is not working ‘hand-in-hand’ with the Westchester County District At *419 torney in investigating and prosecuting this case. Rather, each agency is conducting its own separate, but parallel, investigation.
“The separate nature of these parallel proceedings is best demonstrated by the fact that: (1) the Westchester County District Attorney’s Office neither was present nor participated in any debriefing of Nicholas Mazzarella unless it concerned the events of February 4, 1994; (2) members of the District Attorney’s Office have not seen any of the additional documents the defense now seeks; and (3) after previously refusing disclosure, the U.S. Attorney’s Office only agreed recently to provide the application and search warrant for the Mercedes auto operated by the defendant during the commission of this crime. * * *
“[T]he federal government has denied access to the material the defense seeks, both by its oral refusal to the District Attorney’s Office and its written responses to the defendant’s subpoenas.”
Shortly before trial, defense counsel argued to the Trial Judge that this was a joint State-Federal prosecution and defendant was therefore entitled to disclosure of the FBI 302 reports. The Judge inquired whether the District Attorney had turned over all Brady and Rosario material that was in the People’s possession or control or could reasonably be obtained. Once again, the prosecutor assured the court that the People had disclosed everything within their reach, mentioning particularly the FBI reports pertaining to the events of February 4, 1994. Noting that the parties had not “submitted any authority [establishing that the court had] permission or authority to subpoena the Federal Bureau of Investigation or any other Federal agency to produce documents,” the trial court found that there was no evidence of joint efforts between Federal and State authorities with reference to this case, and that the People had satisfied disclosure requirements.
Both Calore and Nicholas Mazzarella testified at trial. Calore related his observations in the restaurant parking lot, and described his subsequent activities regarding the bloody clothing. Nicholas Mazzarella testified that on February 4, 1994, he saw Alfred Santorelli leave his apartment with two dark-colored trash bags. He also recounted his own extensive criminal background, including convictions for Federal racketeering, *420 witness intimidation, loansharking, armed robbery and his role in a conspiracy to murder an individual named Vincent Russell. Defense witnesses testified that in February 1994, defendant was in the process of moving out of his home and therefore had a lot of trash; that he felt the excess trash on his property was an eyesore; and that he would occasionally place garbage bags in his car and dispose of them in commercial refuse containers in the Bronx. In March 1998, a jury convicted defendant of all four counts of the indictment.
In October 1998, Alfred Santorelli — defendant’s son — was tried on tampering with evidence charges stemming from the Balando murder. Because Darin Mazzarella was a witness at Alfred Santorelli’s trial, the People provided him with Darin’s Grand Jury testimony, which included his recollection that the bags Alfred removed from the apartment were white. Additionally, the People provided Alfred with two redacted FBI 302 reports they received in July 1998. The reports prepared by Agent Galore memorialized interviews with both Mazarella brothers pertaining to the Vincent Russell homicide. The reports indicated that after Nicholas strangled Russell, Darin cleaned up the murder site and dumped a garbage bag in the Bronx.
Defendant sought to have his conviction vacated pursuant to CPL 440.10, alleging that the People withheld material evidence in violation of Brady v Maryland (373 US 83) and People v Rosario (9 NY2d 286, cert denied 368 US 866). Supreme Court rejected defendant’s argument that the People were obligated to produce the 302 reports relating to Nicholas and Darin Mazzarella which concerned another, unrelated homicide, observing that the reports were in the hands of the FBI, an agency not part of the New York State law enforcement chain. The Appellate Division affirmed the conviction and denial of the motion to vacate the judgment, as do we.
Discussion
Central to this appeal is the question whether FBI interview reports pertaining to a Federal investigation were wrongfully withheld from defendant. Defendant urges that the People must be charged with the FBI’s refusal to disclose the requested material, by preclusion of testimony or an adverse inference charge at trial, or by vacatur of the conviction on CPL 440.10 review. We disagree.
Prosecutors play a distinctive role in the search for truth in criminal cases. As public officers they are charged not simply *421 with seeking convictions but also with ensuring that justice is done. This role gives rise to special responsibilities— constitutional, statutory, ethical, personal — to safeguard the integrity of criminal proceedings and fairness in the criminal process.
In Brady v Maryland (373 US 83, supra), for example, the United States Supreme Court held that due process requires prosecutors to disclose information in their possession or control that is both favorable and material to the defense (see, People v Vilardi, 76 NY2d 67, 73; People v Scott, 88 NY2d 888, 890). The requirement that the Brady material be in the People’s possession or control, moreover, has not been interpreted narrowly. A prosecutor must “learn of any favorable evidence known to the others acting on the government’s behalf in the case” and promptly disclose any such material evidence to the defendant (Kyles v Whitley, 514 US 419, 437; see also, Giglio v United States, 405 US 150, 154 [applying agency principles]).
Thus, this Court has charged the People with knowledge of exculpatory information in the possession of the local police, notwithstanding the trial prosecutor’s own lack of knowledge (see, People v Wright, 86 NY2d 591, 598; see also, People v Novoa, 70 NY2d 490, 498 [prosecutor was delinquent in failing to “discover and disclose” terms of cooperation agreement entered into between a trial witness and Special Prosecutor]). The duty to disclose information in these circumstances, of course, cannot be greater than the power to acquire it.
Here, defendant does not question that the People produced all Brady material in their actual possession. Undisputedly, the People did not possess the additional reports defendant seeks. The reports — involving a separate, pre-existing investigation — were in the hands of the FBI, an independent Federal law enforcement agency not subject to State control. While defendant argued that the two agencies were engaged in a joint or cooperative investigation, and that the District Attorney thus had constructive possession or control of the Federal records, the trial court held otherwise, and the record before us supports that undisturbed finding (contrast, United States v Antone, 603 F2d 566, 569-570 [knowledge of State officers could be imputed to Federal prosecutor where there was “extensive cooperation between the investigative agencies” and “entire effort was marked by (a) spirit of cooperation”]). Indeed, the record reflects that there were no undisclosed 302 reports concerning the February 4, 1994 events, and that Federal reports *422 concerning the FBI’s “parallel” but separate investigation were unavailable to either side in this case.
Further establishing the District Attorney’s lack of access to the FBI reports is the record of unsuccessful attempts to obtain them from Federal authorities. On at least two occasions the District Attorney asked the United States Attorney’s Office and the FBI for the reports, and both times was refused on the ground that the FBI considered the materials to be unrelated to the State’s investigation. There is no record support for defendant’s conclusory assertion of the People’s bad faith or the existence of a government conspiracy to deprive defendant of information. That a Federal law enforcement agent served as a fact witness at defendant’s trial does not alter the conclusion that the People did not possess or control — actually or constructively — the additional materials defendant sought.[1]
For much the same reason, we affirm the conclusion of the courts below that there was no Rosario violation.
CPL 240.45, which codified the rule established by this Court in People v Rosario (9 NY2d 286, 289, supra), obligates the prosecution to disclose any recorded statement in its possession or control made by a person the prosecutor intends to call to the stand, which relates to the subject matter of the witness’ testimony. Indeed, the “principal consideration for determining whether prosecutors have a fairness obligation under Rosario to turn over various materials focuses on whether these items actually are in or subject to the possession or control of the particular prosecution office” (People v Kelly, 88 NY2d 248, 252; see also, People v Washington, 86 NY2d 189, 191; People v Flynn, 79 NY2d 879, 882; Preiser, Practice Commentaries, McKinneys Cons Laws of NY, Book 11A, CPL 240.45, at 289).
As in the Brady context, the People cannot be charged with failure to disclose materials they themselves could not obtain from law enfprcement officers answerable to another sovereign (see, People v Kronberg, 243 AD2d 132, 152 [no duty to turn over FBI 302 reports where “New York prosecutors were *423 repeatedly rebuffed in their efforts to obtain the reports”]; People v Leo, 249 AD2d 251, 252 [no evidence of joint investigation and the People were not in control of Federal file], lv denied 92 NY2d 900; United States v Bermudez, 526 F2d 89, 100, n 9 [Jencks Act], cert denied 425 US 970; contrast, People v Rutter, 202 AD2d 123, 131 [prosecutor was “afforded unfettered access” to documents generated by out-of-State police investigation], lv dismissed 85 NY2d 866). People v DaGata (86 NY2d 40) — concerned with the disclosure requirements of CPL 240.20 (1) (c) — does not compel a different result. In DaGata, defendant sought notes the FBI used in preparing a scientific report for the District Attorney. Significantly, “no reason whatsoever” was given for the People’s failure to disclose them (id., at 44).
Finally, we conclude that defendant waived his Antommarchi right to be present at a sidebar discussion during jury selection. The parties disputed the timing and content of an untranscribed discussion, and the Trial Judge accepted their submissions in an effort to settle the record. Defendant argued that prospective jurors were questioned in his absence and that defense counsel improperly purported to waive his Antommarchi right outside his presence. The Trial Judge, however, found otherwise. Based on what he described as his “very vivid recollection” of the events, and on his notes, the Trial Judge concluded:
“For reasons inexplicable to this court, there was colloquy which I do not see in the transcript immediately following page 134 at line 10. This court does recall that when the attorneys assembled at side bar, this court made comment to the effect that at least two, and maybe four, prospective jurors made statements which might give rise to challenge for cause. Attorneys were asked to discuss the matter between themselves and see if there was any consent that could be agreed upon concerning at least two, if not all four, of the prospective jurors. [The prosecutor], at this point, expressed concern concerning Antommarchi principles and the absence of defendant at side bar since defendant was still seated at defense counsel table. [Defense counsel] turned to defense counsel table and in brief words inquired if defendant wished to be at sidebar whereupon defendant indicated that his answer was ‘no,’ accompanied by shaking of his head *424 sideways and moving his hand in a horizontal line gesture, all of which was interpreted as being an answer in the negative. * * *
“The court’s very definite recollection is to the effect that the court reporter was seated, with machine, right there at side bar during this occurrence. In this court’s opinion and to the best of my knowledge and belief, the Antommarchi waiver was received and recorded” (Decision and Order dated Oct. 30, 1998, at 4-5 [emphasis added]).
The Judge further denied defendant’s request for a reconstruction hearing, concluding that such a proceeding would be unnecessary because “the papers and record submitted, together with the court’s clear recollection, are adequate for the court to reconstruct and recall what occurred” (id., at 6).
Defendant argues that the court abused its discretion in denying a reconstruction hearing. We disagree. Trial Judges— responsible for “laboring to elucidate what originally took place before them” — are charged with “passing upon the accuracy of * * * proceedings before them” (People v Alomar, 93 NY2d 239, 245, 247; see also, CPLR 5525 [c] [1]). Not every dispute about the record mandates a reconstruction hearing. Here, the Trial Judge considered, and rejected, defense counsel’s recollection of what transpired at the sidebar.[2] The Judge — “final arbiter of the record” (People v Alomar, supra, 93 NY2d, at 247) — had a very vivid recollection of the disputed proceeding, and under the circumstances, determined a reconstruction hearing was unnecessary.
Moreover, as reconstructed by the Trial Judge, the record establishes that defendant waived his right to. be present at sidebar. We agree with the dissent that this situation is “distinctly different” from the one presented in People v Keen (94 NY2d 533, 536) — it is even more compelling. In Keen, the Trial Judge asked defense counsel, not defendant, whether his client would waive the right to be present at the sidebar questioning of prospective jurors, and defense counsel responded in the affirmative. Here, the Trial Judge found that *425 counsel asked defendant, who was seated at counsel table, whether he wished to be present at the sidebar discussion, and defendant indicated that he did not.
Defendant’s remaining contentions, to the extent preserved, are without merit.
Accordingly, the orders of the Appellate Division should be affirmed.

. We similarly reject defendant’s contention that the Grand Jury testimony of nonwitness Darin Mazzarella constituted Brady material. Even if we were to consider this testimony “favorable,” there is no reasonable possibility that conflicting testimony regarding the color of the trash bags used by defendant’s son would have affected the outcome of this case (see, People v Vilardi, supra, 76 NY2d, at 77). Darin was examined about the discrepancy at the trial of defendant’s son, who was nonetheless convicted of the same crimes as defendant; moreover, defendant’s fingerprints implicated him in the crime.

. The Trial Judge explicitly rejected the statement of one of defendant’s lawyers that he erroneously believed he alone could waive Antommarchi, without consulting with his client (dissenting opn, at 425). The Trial Judge rejected this statement “as not being in accord with [his] recollection of words and circumstances existing throughout the trial, as exhibited by this highly skilled, most learned and knowledgeable counsel” (Decision and Order dated Oct. 30, 1998, at 2).