People v Hoffman (2023 NY Slip Op 06004)

People v Hoffman

2023 NY Slip Op 06004

Decided on November 22, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:November 22, 2023

112507
[*1]The People of the State of New York, Respondent,
v
Brendan Hoffman, Appellant.

Calendar Date:October 17, 2023

Before:Garry, P.J., Lynch, Reynolds Fitzgerald, Fisher and Powers, JJ.

Aaron M. Rubin, New York City, for appellant.
Mary Pat Donnelly, District Attorney, Troy (George J. Hoffman Jr. of counsel), for respondent.

Garry, P.J.
Appeal, by permission, from an order of the County Court of Rensselaer County (Debra J. Young, J.), entered August 21, 2020, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment convicting him of the crimes of aggravated vehicular homicide, vehicular manslaughter in the first degree, manslaughter in the second degree, driving while intoxicated (three counts), leaving the scene of an incident without reporting and reckless driving, after a hearing.
The facts of the criminal matter underlying this collateral proceeding are extensively discussed in our decision on defendant's direct appeal (130 AD3d 1152 [3d Dept 2015], lv denied 26 NY3d 1009 [2015]). Briefly, around midnight on June 28, 2012, a vehicle occupied by defendant and Christopher Baker (hereinafter the victim) — both of whom had been drinking beer and smoking marihuana throughout the evening — lost control, struck a culvert pipe and flipped several times before landing on its roof. The victim was ejected from the vehicle and died, and defendant fled the scene. The Rensselaer County Sheriff's Department commenced an investigation, aided by the North Greenbush Police Department, which was tasked with surveilling the accident scene with a computerized instrument known as the Nikon Total Work Station. Ultimately, defendant was indicted upon multiple crimes, including several counts of aggravated vehicular homicide and vehicular manslaughter in the first degree. At the grand jury proceeding that resulted in that indictment, Douglas Pinzer, a sergeant with the North Greenbush Police Department and a trained accident reconstructionist, provided testimony as to his estimates of the vehicle's speed, arrived at by using the data obtained via the Total Work Station. Following that indictment, the prosecutor then assigned to the case made a disclosure to defendant, which he characterized as Brady material, that Pinzer's grand jury testimony as to his speed calculations were based on "inaccurate calculations"; in the face of repeated requests for a more detailed disclosure, the prosecutor further represented that "the particular equation" used by Pinzer to calculate speed "does not apply to how this car approached the curve." The prosecutor informed County Court that, because of the errors, the People intended to instead utilize "a collision expert from the State Police" at trial. Based on the disclosure, defendant moved to dismiss the indictment, and the court granted the motion in view of the potential prejudice to defendant from the erroneous expert testimony, with leave to re-present the charges. The People presented the case to a different grand jury 10 days later, without Pinzer's testimony, and defendant was charged by the resulting indictment with the same and additional charges.
A month before trial, having received no further disclosure regarding any expert analysis of the accident, among other issues, defendant again requested that all expert opinions be turned over[*2]. County Court directed the People to produce any documents generated by the State Police regarding reconstruction of the accident. In response, the prosecutor explained that, after taking over the case and reviewing the evidence, he and the Rensselaer County Sheriff's Department made a request to the State Police for assistance with trial preparation; two members of the State Police were assigned to review "the existing crash analysis and the available evidence, . . . including the speed calculations performed by . . . Pinzer": Bruce McGloughlin, an investigator, and Jeremy Shultis, a trooper. After that review, the State Police consultants informed the prosecutor that "they did not think that the method used to calculate speed would produce a reliable estimate under the circumstances of this case." It was this conflicting opinion that the prosecutor believed to be exculpatory Brady material, providing defendant with the grounds for his successful motion. The prosecutor otherwise maintained that he had turned over all material within or ahead of legal requirements, asserting that the State Police were consultants only and had not prepared a collision report. Shultis, however, was still expected to testify at trial as to his review. To that end, the prosecutor provided certain notes that Shultis had prepared, while representing that Shultis could not locate all relevant forms.
At trial, expert witnesses were called to opine on, among other things, the central question of who was operating the vehicle at the time of the accident. The People again did not call Pinzer, or any accident reconstructionist, instead relying upon a medical expert, Michael Sikirica. Sikirica opined that, based upon his autopsy of the victim and review of crime scene photographs provided by law enforcement, the victim's death was related to skull and brain injuries sustained "from the top downward" when he struck the roof above the front passenger seat as the roof was being crushed by the impact of the crash. Given the location of the roof damage, Sikirica, a forensic pathologist, testified that the victim was seated in the front passenger seat. Defendant relied upon the expert testimony of an accident reconstructionist, Bradford Silver. Silver utilized several mathematic formulas involving speed, including the speed of the vehicle prior to the accident and the rotational velocity of the vehicle as it was flipping, and concluded that the victim would have had to have been seated in the driver's seat to have been ejected from the vehicle in the manner that he was. Significant to this appeal, the data relied upon by Silver was that obtained by the North Greenbush Police Department following the accident via the Total Work Station; Silver had been unable to collect the same data himself as the road at issue was resurfaced weeks following the accident. At the conclusion of the trial, the People accepted missing witness charges for both Pinzer and Shultis; notably, Shultis had been [*3]present in the courtroom during trial. The jury found defendant guilty on all of the charges presented. Following the verdict, County Court set aside the verdict as to certain counts not relevant here and sentenced defendant to a prison term of 5 to 15 years on the top count and equal and lesser concurrent terms of incarceration for his remaining convictions. On appeal, this Court reversed certain convictions as multiplicitous and reversed the court's dismissal of certain counts (130 AD3d at 1154-1155). Following remittal, it appears that defendant was resentenced to an aggregate prison term of 8&frac13; to 25 years.
Meanwhile, defendant pursued a lengthy postconviction investigation, during which Pinzer, by then retired, was located and interviewed. During his meetings with investigators, Pinzer expressed surprise by the prosecutor's representations regarding his calculations and explained that the issue had instead been that he, with the assistance of a State Police "reconstructionist" whose name he could not recall, determined that the North Greenbush Police Department officers who operated the Total Work Station at the accident scene mistook shadows from overhead utility lines as tire marks, thereby corrupting the only tire mark data available. In August 2019, defendant moved to vacate the judgment of conviction on the basis that the prosecutor deliberately misrepresented the limited evidence that he had disclosed regarding Pinzer and committed a Brady violation (see CPL 440.10 [1] [b], [c], [d], [f], [g], [h]). Defendant asserted that the prosecutor knew about Pinzer's expert opinion regarding the faulty data and was under an obligation to disclose it but instead repeatedly attempted to conceal it and, ultimately, exploited that knowledge at trial to, among other things, impugn Silver's credibility. Following the People's opposition and a hearing, County Court denied defendant's motion, finding that he failed to satisfy any aspect of his Brady claim.[FN1] Defendant appeals with this Court's permission, and we reverse.
The People have an obligation under Brady v Maryland (373 US 83 [1963]) "to disclose evidence and information in their possession that is both material and favorable to the defense" (People v Giuca, 33 NY3d 462, 473 [2019]; see Brady v Maryland, 373 US at 87). This state's approach to "due process in this area is, in large measure, predicated both upon elemental fairness to the defendant, and upon concern that the prosecutor's office discharge its ethical and professional obligations" (People v Vilardi, 76 NY2d 67, 76 [1990] [internal quotation marks and citation omitted]; see People v Garrett, 23 NY3d 878, 884 [2014]). "To make out a successful Brady claim, a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (People v McGhee, 36 NY3d 1063[*4], 1064-1065 [2021] [internal quotation marks and citations omitted]; see People v Ulett, 33 NY3d 512, 515 [2019]). In this state, when "the defendant [has] made a specific request for the evidence in question, we must examine the trial record, evaluate the withheld evidence in the context of the entire record, and determine in light of that examination whether there is a reasonable possibility that the result of the trial would have been different if the evidence had been disclosed" (People v McGhee, 36 NY3d at 1065 [internal quotation marks, brackets and citation omitted]; see People v Vilardi, 76 NY2d at 77-78). Additionally, because defendant asserts this Brady violation in the context of a CPL article 440 motion, he bore " 'the burden of proving by a preponderance of the evidence every fact essential to support the motion' " (People v Thibodeau, 31 NY3d 1155, 1158 [2018], quoting CPL 440.30 [6]; see People v Giuca, 33 NY3d at 474).
Defendant called three witnesses at the hearing: Pinzer, Silver and his trial counsel, Peter Moschetti. Pinzer testified as to his extensive training and experience in accident reconstruction and with the Total Work Station. He first explained that proper operation of the instrument requires three people; however, when the North Greenbush Police Department was dispatched to aid the Rensselaer County Sheriff's Department with the investigation of the subject accident, only two officers were sent. One officer had experience assisting with the operation of the Total Work Station but did not have experience in accident reconstruction, and the other was a new officer with little experience generally. Pinzer's role in this particular investigation was to utilize the measurement data obtained via the Total Work Station to complete a computerized drawing of the scene and calculate an estimate of the vehicle's speed. Early in his analysis, Pinzer realized that some of the data points "did not make sense" — meaning not that the measurements were incorrect per se, but that it was unclear what the data points in fact were. Given that the subject road had been resurfaced shortly after the accident, he contacted the Rensselaer County Sheriff's Department to obtain photographs of the scene to aid in his review. Finding it "still a little bit difficult" to discern what certain measurements were based upon, he contacted the State Police Investigative Unit for assistance. A "trooper" who "could have been" Shultis aided in Pinzer's review. Together, the two determined that the officers who obtained the data from the accident scene mistakenly identified shadows cast on the roadway from the overhead utility lines as tire marks. Once that determination was made, data points determined to be erroneous were not considered by Pinzer. After his determination and before he testified at the first grand jury proceeding, Pinzer had two meetings with members of the District Attorney's office and the Sheriff's Department to "discuss the case." In [*5]his affidavits, Pinzer recalled reviewing his diagram and speed estimations at those meetings and suggesting additional reconstruction ideas to assist the People in proof of operation. Pinzer made clear that he could not recall whether he specifically told the District Attorney or any of the representatives at those meetings about his determination regarding shadows. He did recall informing the deputy from whom he obtained the photographs about his determination. At the grand jury proceeding, Pinzer testified about his training, role in the investigation, skid marks, yaw marks, friction coefficients and his estimated speed of the vehicle — between 79 and 85 miles per hour. Notably, Pinzer was not asked any questions that would have provided him the opportunity to explain his concerns about the erroneous data. After his testimony before the first grand jury, Pinzer was not contacted again by the People regarding the case.
Silver testified as to his extensive training and background in accident reconstruction, which notably included training Pinzer. Silver, who historically only performed accident reconstruction work for law enforcement, explained that he was retained by defendant to determine who was operating the subject vehicle at the time of the accident. To that end, he was provided the materials that defendant had received in discovery, including the Total Work Station data, photographs of the scene and the accident diagram that Pinzer had generated. Silver too had difficulty with some of the data points, finding that his diagram did not exactly align with that prepared by Pinzer. He also found that certain standard formulas returned illogical results when the data was input. For these reasons, Silver elected to utilize multiple methods for determining things like speed — a decision on which he was repeatedly cross-examined at trial. For example, the prosecutor suggested through his questioning that some of Pinzer's "calculations were so speculative that [he] didn't even use them." The prosecutor also asked a number of questions to imply that Silver's data collection was not as reliable as the "accurate" measurements obtained by the North Greenbush Police Department that were provided to him. Similarly, during the People's summation, the prosecutor stated that "[t]he proof showed that [Silver] used calculations selectively" and "[kept] trying things until [he got] the answer that [he] want[ed]," directly arguing that "[i]t [wa]s not a reliable way to do things." Silver went on to further testify at the hearing that, although knowledge of the subject data issues would not have changed his ultimate conclusion as to who was operating the vehicle, it did have a direct and significant impact on his methodology and findings. For example, had he known that the data was corrupted, he would have performed his analysis differently and explained to the jury why law enforcement's data was unreliable; he would have also been able to rebut any challenge to [*6]his credibility for the use of multiple formulas and his own data. He also averred that, in light of the new information regarding the data, his trial testimony as to the vehicle's speed prior to the accident — 55 to 65 miles per hour — was overstated.
Moschetti testified that he viewed this case as being exclusively about who was driving the vehicle at the time of the accident. He accordingly retained Silver as an expert, under the belief that the People would also be putting forth reconstruction. Moschetti testified that, other than being told by the prosecutor that Pinzer had made a calculation error regarding the speed of the vehicle, no further information was provided, despite his numerous inquiries about the nature of that error, both on and off the record. Moschetti testified that his trial strategy would have been different if he had known about the data issue; he would have allocated resources differently with respect to reconstruction and/or spent his time with Silver differently. He explained that, as a defense attorney, he did not believe that he could have subpoenaed Pinzer or Shultis without risking committing malpractice and violating defendant's right to the effective assistance of counsel, given the uncertainty as to what those typically adverse witnesses would say.
Initially, despite some confusion generated by the People's imprecise cross-examination during the hearing, we do not agree with County Court that Pinzer's testimony was internally contradictory or inconsistent with his affidavits.[FN2] We similarly find any suggestion by the court that Pinzer was motivated by personal animus toward the People to be unsupported by the record.
Turning to the first prong of Brady, "[i]t is fundamental that material evidence which is in the possession of the prosecution and which is exculpatory in nature must be turned over to the defendant in order to give meaning to the constitutional right to a fair trial," and "[i]t is equally true that when the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule" (People v Cwikla, 46 NY2d 434, 441 [1979] [internal quotation marks, brackets and citations omitted]; see People v Garrett, 23 NY3d at 886). Pinzer's opinion certainly could have been used to discredit law enforcement's evidence collection and the caliber of their investigation generally (see Kyles v Whitley, 514 US 419, 446-447 [1995]). Similarly, defendant's decision not to subpoena Pinzer to explore his allegedly incorrect math was a far different question than that which would have been presented had defendant known about Pinzer's opinion implicating the accuracy of the subject police work. Even more broadly, defendant established that Moschetti's trial strategy would have undoubtedly been impacted by the knowledge that the data available for reconstruction was faulty (see United States v Bagley, 473 US 667, 682-683 [1985]). Perhaps [*7]most significantly, the information that was withheld bore directly on evidence determinative of defendant's guilt or innocence. As illustrated above, Silver, deprived of Pinzer's opinion, was unable to answer for the discrepancies in his diagram and the illogical results of his initial calculations or defend against attacks for his use of other data and methodologies. We acknowledge that, for the purpose of Brady, exculpatory evidence is ordinarily that which more directly bears upon guilt or innocence (see People v Ross, 43 AD3d 567, 568 [3d Dept 2007], lv denied 9 NY3d 964 [2007]) and impeachment evidence typically concerns government witnesses who will be testifying against a defendant (see People v Garrett, 23 NY3d at 886). However, in view of the character of the withheld information here, the misleading disclosure that was made, the manner in which the prosecutor elected to act on Silver's testimony of defendant's innocence and the circumstantial nature of this case, we agree with defendant that Pinzer's opinion regarding the Total Work Station data must be considered favorable to the defense.
As for the second prong, we find that the People suppressed the favorable evidence, whether willfully or inadvertently. The People are required to disclose Brady material within their "custody, possession, or control" (People v Garrett, 23 NY3d at 886; see People v Santorelli, 95 NY2d 412, 421 [2000]). "What constitutes possession or control for Brady purposes has not been interpreted narrowly, and it is beyond cavil that the government's duty to disclose under Brady reaches beyond evidence in the prosecutor's actual possession" (People v Garrett, 23 NY3d at 886-887 [internal quotation marks and citations omitted]; see People v Lewis, 167 AD3d 158, 161 [3d Dept 2018], lv denied 33 NY3d 1033 [2019]). Further, it is by now well established that " 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police' " (People v Garrett, 23 NY3d at 887, quoting Kyles v Whitley, 514 US at 437; see People v Wright, 86 NY2d 591, 598 [1995]). Here, the North Greenbush Police Department was formally called upon to aid the Rensselaer County Sheriff's Department in their investigation of the subject accident, and the police assigned Pinzer to perform an accident reconstruction based upon the data obtained by its officers. He created the accident reconstruction diagram that was turned over by the People as part of discovery. He met with the People as well as representatives of the lead investigatory agency about his analysis, and he testified in his professional capacity before the first grand jury; during that proceeding, the People acknowledged that he was a part of the investigation, and both the People and County Court considered him to be an expert witness at that time. Although Pinzer testified that he could not recall whether he specifically shared with the People [*8]his opinion that some of the data points denoted as tire marks were shadows, Pinzer was an arm of the prosecution, acting on the government's behalf, and the People had a duty to learn of his opinion, which "directly relates to the prosecution or investigation of . . . defendant's case" (People v Garrett, 23 NY3d at 888; compare People v Santorelli, 95 NY2d at 421-422). It is not disputed that Pinzer's opinion was not disclosed, and defendant therefore also met his burden as to the second Brady prong.
As for the third and final prong, it is well established that "suppression, or even negligent failure to disclose, is more serious in the face of a specific request in its potential to undermine the fairness of the trial," hence the reasonably possibility standard employed by courts of this state (People v Vilardi, 76 NY2d at 77). The Court of Appeals has also endorsed the proposition that "the required showing of prejudice" may "vary inversely . . . with the degree to which the conduct of the trial has violated basic concepts of fair play" (id. at 76 [internal quotation marks and citations omitted]). There can be no doubt that reconstruction of the accident was a material issue in this case. There was no direct evidence as to who was operating the subject vehicle at the time of the accident, and the evidence to that end was in large part the competing expert testimonies (130 AD3d at 1155-1157). As we previously acknowledged, given those competing opinions, it would not have been unreasonable for the jury to conclude that defendant was not driving the vehicle at the time of the accident (id. at 1157). Without disclosure of Pinzer's opinion as to the subject data, defendant was unable to explore certain areas of impeachment and defend against others, and the People enjoyed an unfair advantage in those same respects. Based upon our examination of the trial record and evaluation of the withheld evidence, we cannot say — under the less demanding standard applicable here — that there was no reasonable possibility that the People's failure to disclose Pinzer's opinion did not impact the verdict (see generally People v Vilardi, 76 NY2d at 78). The prosecutor's cross-examination of Silver and his statements in summation — which sought to both bolster the legitimacy of police work that he should have known was faulty and impugn the credibility of Silver for not exclusively relying upon same — "compounded the prejudice" to defendant (People v Cwikla, 46 NY2d at 442; see People v Ulett, 33 NY3d at 521). We therefore find that defendant's motion should have been granted and his judgment of conviction vacated.
Lynch, Reynolds Fitzgerald, Fisher and Powers, JJ., concur.
ORDERED that the order is reversed, on the law, motion granted and matter remitted to the County Court of Rensselaer County for a new trial.

Footnotes

Footnote 1: County Court also found that other information allegedly withheld — specifically, that Pinzer was not present when the subject data was collected — was in fact known to defendant at the time of trial and, thus, could have been raised on direct appeal. Defendant does not challenge this ruling.

Footnote 2: On appeal, neither party has addressed County Court's passing credibility comment.