■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DIONISIO SOMERVILLE, Also Known as TONY APONTE, Also Known as BORN, Appellant. [671 NYS2d 779] —Crew III, J. Appeal from a judgment of the County Court of Schenectady County (Harrigan, J.), rendered January 10, 1994, upon a verdict convicting defendant of the crimes of murder in the second degree (two counts), conspiracy in the second degree, conspiracy in the fourth degree (two counts), criminal facilitation in the second degree, criminal facilitation in the fourth degree (two counts), robbery in the first degree (seven counts), criminal use of a firearm in the first degree (four counts), criminal possession of a weapon in the second degree (two counts), criminal possession of a weapon in the third degree (two counts), criminal possession of a controlled substance in the third degree, criminal possession of a controlled substance in the fourth degree, hindering prosecution in the first degree and hindering prosecution in the second degree.

On September 5, 1990, defendant and Darrell Thomas conspired to rob Martin McCollum. In accordance with the

prearranged plan, Thomas lured McCollum to a secluded spot in the City of Schenectady, Schenectady County, where defendant, masked and armed, robbed McCollum and feigned a robbery of Thomas.

Thereafter, on October 23, 1990 defendant, pursuant to a prearranged plan, gave Thomas a .32-caliber revolver and Thomas lured James Mannix into Vale Cemetery where he shot and killed Mannix and stole $200 from him. Defendant and Thomas divided the proceeds of the robbery and shared the considerable stash of Mannix's drugs that were secreted in Thomas' apartment.

Defendant, in an effort to deflect any suspicion that might be directed at him, thereafter made anonymous phone calls to the police, the District Attorney's office and a local television station advising that he had observed a blue Mercedes-Benz automobile drive to the entrance of Vale Cemetery, whereupon three black males exited the vehicle and entered the cemetery. Moments later, according to defendant, two black males returned to the car and drove off.

Shortly after the homicide, defendant was contacted by the police and on three different occasions over a five-day period variously stated that he did not know the victim, that he did know the victim and was with him for a period of time on October 23, 1990 and, finally, when he last saw the victim on that date, he was climbing into a blue Mercedes-Benz which then drove away.

In December 1991, defendant was arrested and charged with numerous sales of cocaine. While in jail pending disposition of the drug charges, defendant telephoned Investigator Robert McHugh, who had questioned defendant about the homicide a year earlier, and offered to act as a confidential drug informant in exchange for leniency regarding his pending charges. McHugh rejected the offer but advised that he would be interested in any further information regarding the Vale Cemetery homicide.

Ultimately, defendant agreed to provide additional information regarding the homicide as a result of which Bruce Rubin (defendant's attorney in the pending drug charges), Joseph Aponte (Rubin's paralegal and defendant's uncle), McHugh, Assistant District Attorney Phillip Mueller and three additional investigators met at the District Attorney's office on December 27, 1991. Prior to any conversation, defendant met privately with his attorney and his uncle. Defendant then gave a fourth version of his knowledge of the events of October 23, 1990, in which he added considerable detail to the third state-

ment he previously had given the police and described an individual who he claimed was the "shooter". When defendant was advised that the individual he described had an alibi for that date, defendant became agitated and the questioning ceased while defendant consulted privately with his attorney and his uncle.

The meeting reconvened with defendant expressing a desire to continue. After being advised of his *Miranda* warnings, defendant proceeded to give a fifth version of his knowledge of the events of October 23, 1990. In this version, defendant admitted that his previous statements had been false. He then advised that he had loaned Thomas a gun a week before the murder. When defendant went to Thomas' house to retrieve the gun, Thomas told him he had shot Mannix in the cemetery. Defendant said that he did not believe Thomas, but he nevertheless wiped the gun of fingerprints and threw the gun and clip separately into two sewer drains, the location of which he described.

After relating this fifth version of events, defendant was advised that a plea offer would be extended if that version could be verified to the satisfaction of the District Attorney. In an effort to verify defendant's story, defendant was asked if he would submit to a polygraph test and he agreed. Defendant and his attorney further agreed that defense counsel need not be present during the test unless a written statement was to be taken. Four days later, on December 31, 1991, Investigator James Horton met with defendant for the purpose of administering the polygraph examination. During the pretest interview, while Horton was questioning defendant concerning his personal history and explaining how the polygraph machine worked, defendant broke down, admitted that all of his prior statements were false and confessed that he had planned and assisted Thomas in the murder and robbery of Mannix. In response to questioning by Horton, defendant gave a detailed version of all of the events leading up to the homicide. A written statement was not taken, however, due to the absence of defendant's attorney.

Defendant was indicted and charged in 28 counts with, *inter alia*, murder, robbery and conspiracy. Following a jury trial, defendant was convicted of 27 of the 28 counts and sentenced to, *inter alia*, an indeterminate term of imprisonment of 25 years to life. Defendant appeals.

Of all the issues raised by defendant on appeal, the most vexing is his claim that there should be a reversal because the prosecutor's conduct at trial improperly allowed him to become

an unsworn witness against defendant. Prior to trial, defendant moved to recuse Assistant District Attorney Mueller from trying the case because he had been present during the questioning of defendant on December 27, 1991 and, inasmuch as the statements given by defendant at that time would be offered in evidence at the trial, defendant contended that Mueller should be disqualified. County Court denied defendant's motion, a ruling with which we concur.

It is now well established that there are two bases for a motion to disqualify a prosecutor because of his or her pretrial involvement with the case against a defendant: the "advocate-witness rule" and the "unsworn witness rule" (see, People v Paperno, 54 NY2d 294, 299). With regard to the former, a prosecutor will be disqualified where it appears that he or she "will be called as a witness for the People, to testify to a disputed material issue" or where he or she will be called to testify for the defendant and such testimony will be adverse to the People (id., at 300). Here, it is clear that the "advocate-witness rule" was not applicable and defendant's motion was properly denied. There plainly was no need to call Mueller as a witness for the People in that there were four investigators present who were available to testify and Mueller's testimony would be merely cumulative. Likewise, it is clear that were Mueller to be called as a witness for the defense, his testimony would not have been adverse to the People.

The issue of the "unsworn witness rule" proves a little more problematic. In order for defendant to prevail on his motion to disqualify on this basis, it was incumbent upon him to establish, pretrial, that there was a significant possibility that Mueller's presence during the December 27, 1991 questioning would be a material issue in the case (see, id., at 302). This he failed to do and County Court properly denied his motion. However, this did not end County Court's inquiry because "there [was] nevertheless some danger that the prosecutor's pretrial activity might allow him to unfairly influence the jury by injecting his own credibility into the trial" (id., at 303). Accordingly, County Court was required to take steps to avoid such potential prejudice, which it did by ordering that Mueller was to make no reference to his presence at the December 27, 1991 meeting during the course of the trial.

During trial, Mueller complied with County Court's directive until defense counsel disclosed Mueller's presence at the meeting through examination of a witness. At that point, at a sidebar, Mueller requested that he be freed from the strictures imposed upon him by County Court. Defense counsel agreed

that Mueller should thereafter be allowed to refer to his pretrial participation and County Court permitted same. Given that, we are of the view that defense counsel waived any claim, arising thereafter, to a violation of the "unsworn witness rule". Moreover, inasmuch as there was no claim that the statements made at the December 27, 1991 meeting were anything but voluntary, there can be no suggestion that proof of Mueller's participation at the meeting improperly suggested that he personally attested to the validity of the statements obtained at that time.

We likewise reject defendant's contention that County Court erred in failing to suppress the statements made by him on December 31, 1991. The record makes plain that defendant, in the presence of counsel, agreed to further interviews and a polygraph test in the absence of counsel unless a written statement was to be taken. Defendant's incriminatory statement was made during the course of administering the polygraph test and was not reduced to writing. We find, therefore, that he waived all objections that are now being tendered. We have considered defendant's remaining contentions, including those proffered in his *pro se* brief, and find them to be equally without merit.

Mikoll, J. P., Yesawich Jr., Spain and Carpinello, JJ., concur. Ordered that the judgment is affirmed.