[822 NYS2d 786]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CHRISTINE A. WILHELM, Appellant.

Third Department, August 24, 2006

### APPEARANCES OF COUNSEL

*Jerome K. Frost, Public Defender*, Troy, for appellant.

*Patricia A. DeAngelis, District Attorney*, Troy (*Jennifer C. Shatz* of counsel), for respondent.

### OPINION OF THE COURT

MERCURE, J.P.

In September 2001, defendant was diagnosed with a psychotic disorder, a condition that caused her to fear that her husband belonged to a cult and planned to torture or murder their two sons, Peter and Luke (born respectively in 1996 and 1998). She was hospitalized twice and prescribed various medications, which she periodically stopped taking due to unpleasant side effects. On the early evening of April 15, 2002, she had been off her medication for approximately a month when she tied a dog leash around five-year-old Peter's feet and lowered his head into a bathtub filled with water. When Peter struggled and asked her to stop, she pulled him from the water, apologized and helped both of the children dress in pajamas. Defendant's parents telephoned her and, after defendant described her attempt to drown Peter, she reassured them that she would call the police. Defendant did not call the police, however, because her parents evidently informed her that her husband would get custody of the children if she did so.

Instead, defendant carried four-year-old Luke, who had fallen asleep, to the bathtub and placed him under the water. When he struggled, defendant pulled Luke from the tub, resuscitated him and placed him back in bed with Peter. After lying down with both boys for a time, defendant observed that Luke's breathing was labored and that his stomach was hot. She then told him that she would "go to jail for [him]," took him back to the

bathroom and placed him face up beneath the water in the tub, holding him down until he stopped struggling. She called 911 and informed the dispatcher that she had killed her son.

Officer Anthony Silvestro, the first police officer on the scene, arrived at defendant's home at approximately 2:00 A.M. on April 16, 2002. Defendant informed Silvestro that she had killed her son and that the death was a "mercy killing." She showed Silvestro the body in the tub and told him that Luke had died 20 minutes earlier. Silvestro placed defendant under arrest, handcuffing her and putting her in the back of his police car. He then went to find Peter, who was still sleeping. Upon awakening, Peter told Silvestro that "Mommy drowned me," and described the earlier incident with the leash. Peter also mentioned his brother and told the officer that defendant had drowned Luke. After separate rescue squads took Luke and Peter from the house, Silvestro read defendant her *Miranda* rights, to which defendant responded that she had killed her son but would not speak further without a lawyer.

Thereafter, Silvestro drove defendant to the Village of Hoosick Falls Police Department, where she was placed in a holding cell at approximately 4:30 A.M. Two hours later, she was interviewed by two police investigators regarding whether her husband was responsible for signs of suspected sexual abuse found on Luke's body. Although the investigators informed defendant that they did not wish to discuss Luke's drowning, defendant informed them that the incident was "an act of mercy" because her husband was sexually abusing the children.[1] Later that morning, defendant was placed on active supervision because she was considered to be suicidal and was briefly monitored by the prosecutor while she used the bathroom. She was also supervised by a police matron, Catherine Duket, to whom she confessed to killing Luke. Following her arraignment at approximately 2:00 P.M., defendant was interviewed by Casi Maloney and Kathleen McGarry, caseworkers from Child Protective Services (hereinafter CPS), who were investigating a hotline report regarding her abuse of Peter and Luke. In describing the incident to the CPS caseworkers, defendant stated, among other things, that she initially pulled Luke out of the bathtub and resuscitated him because she knew that what she was doing was wrong. Defendant also informed the CPS caseworkers that she had brought the children into her relationship with her

---

1. The doctor who performed the autopsy on Luke's body ruled out any possibility that his injuries were caused by sexual abuse.

husband and that she needed to fix the situation "by taking care of it, meaning drowning the kids." It is undisputed that the People did not provide notice pursuant to CPL 710.30 of their intent to offer evidence of defendant's statements at trial.

■■ On April 19, 2002, defendant was charged in an indictment with three counts of murder in the second degree and one count of attempted murder in the second degree. She served a notice of intent to offer psychiatric evidence at trial, intending to show that she lacked responsibility for her crimes because she was insane at the time they were committed. County Court denied defendant's subsequent motions to suppress her admissions to Duket, to preclude her statements to the CPS caseworkers and for a mistrial, and quashed her subpoena to call the prosecutor as a witness. Following trial, a jury found defendant guilty of one count of murder in the second degree and one count of attempted murder in the second degree, rejecting her insanity defense. County Court sentenced her to an aggregate prison term of 50 years to life and defendant now appeals. Because we conclude that defendant's statements to the CPS caseworkers were admitted in violation both of her right to counsel and CPL 710.30, and the error cannot be said to be harmless under the circumstances presented here, we now reverse and remit the matter for a new trial.

Pursuant to CPL 710.30, "the People must give notice to the defendant whenever they 'intend to offer at a trial . . . evidence of a statement made by a defendant to a public servant' which would be suppressible if involuntarily made" (*People v Chase*, 85 NY2d 493, 499-500 [1995], quoting CPL 710.30 [1] [a]). The central purpose of the statute "is to inform a defendant that the People intend to offer evidence of a statement to a public officer at trial so that a timely motion to suppress the evidence may be made" (*People v Rodney*, 85 NY2d 289, 291-292 [1995]; *see People v O'Doherty*, 70 NY2d 479, 488 [1987]; *People v Briggs*, 38 NY2d 319, 322-323 [1975]). An admission or statement by a defendant regarding his or her participation in the charged offense is suppressible—and therefore subject to the notice requirement of CPL 710.30—if it is "involuntarily made," as defined in CPL 60.45 (1) (*see* CPL 710.20 [3]). As relevant here, that statute provides that

> "[a] confession, admission or other statement is 'involuntarily made' by a defendant when it is obtained from him [or her] . . . [b]y a public servant engaged in law enforcement activity or by a person then acting under his [or her] direction or in cooperation with him [or her] . . . in violation of such rights as

the defendant may derive from the constitution of this state or the United States" (CPL 60.45 [2] [b] [ii]). Hence, it has long been held that CPL 710.30 notice need not be given where the statement to be offered at trial was made to an individual who is "neither a public servant nor acting as an agent of law enforcement authorities" (*People v Rodriguez*, 114 AD2d 525, 526 [1985], *lv denied* 66 NY2d 1043 [1985]; *see e.g. People v Johnson*, 303 AD2d 830, 833-834 [2003], *lvs denied* 99 NY2d 655 [2003], 100 NY2d 583 [2003]; *People v Batista*, 277 AD2d 141, 142-143 [2000], *lv denied* 96 NY2d 825 [2001]; *People v Quinto*, 245 AD2d 121, 121 [1997]; *see also People v Mirenda*, 23 NY2d 439, 448-449 [1969]; *People v Miller*, 142 AD2d 760, 761 [1988]).

In determining whether defendant was entitled to pretrial notice under CPL 710.30 (1) so that she could seek suppression in this case, we must evaluate the notice requirement in light of defendant's assertion that the statements to the CPS caseworkers were obtained in violation of her constitutional rights (*see* CPL 60.45 [2]; *People v Rodney, supra* at 292), specifically her claim that her right to counsel was violated. The People concede that defendant's right to counsel had indelibly attached prior to the interview by the CPS caseworkers (*see People v West*, 81 NY2d 370, 373-374 [1993]; *People v Samuels*, 49 NY2d 218, 221 [1980]) and that because defendant was represented by counsel, she could waive that right only in the presence of counsel (*see People v Settles*, 46 NY2d 154, 165-166 [1978]). In addition, as defendant asserts, because her right to counsel had attached, any statements obtained "through interrogation by agents of the [s]tate" must be suppressed (*People v Velasquez*, 68 NY2d 533, 537 [1986]; *see People v Knapp*, 57 NY2d 161, 173-174 [1982], *cert denied* 462 US 1106 [1983]).[2] There is no dispute that defendant's statements to the CPS caseworkers were not spontaneous but, instead, the result of the caseworkers' interview. Thus, the question before us turns on whether defendant's statements to the CPS caseworkers were involuntary because they were the product of interrogation by "public

---

**2.** "The right of any defendant, however serious or trivial [her] crime, to stand before a court with counsel at [her] side to safeguard both [her] substantive and procedural rights is inviolable and fundamental to our form of justice" (*People v Settles, supra* at 161 [citation omitted]). Hence, defendant's failure to move for suppression of the statements to the CPS caseworkers does not foreclose her argument on appeal that the statements should have been suppressed, in addition to precluded pursuant to CPL 710.30 (*see People v Samuels, supra* at 221; *People v Arthur*, 22 NY2d 325, 329 [1968]).

servant[s] engaged in law enforcement activity or by a person then acting under [their] direction or in cooperation with [them]" (CPL 60.45 [2] [b]; *see People v Greene*, 306 AD2d 639, 640-641 [2003], *lv denied* 100 NY2d 594 [2003]).

In that vein, it is well settled that interrogation by agents of the state "includes not only formal questioning by the police or prosecutor, but also more subtle forms of [s]tate inducement to make incriminating statements" (*People v Velasquez, supra* at 537; *see People v Maerling*, 46 NY2d 289, 302-303 [1978]). Moreover, the state may not defeat a defendant's constitutional right to counsel by claiming that only private acts were involved "when government officers, subject to constitutional limitations, have participated in the act" (*People v Jones*, 47 NY2d 528, 533 [1979]). In other words, while "statements induced by nongovernmental entities, acting privately, do not fall within the ambit of this exclusionary rule . . . [,] the [s]tate cannot, through the facade of private citizens, elicit incriminating evidence without infringing [a] defendant's right to counsel" (*People v Velasquez, supra* at 537; *see People v Jones, supra* at 533-534). Therefore, when private conduct "become[s] so pervaded by governmental involvement that it loses its character as such," constitutional limitations on governmental conduct are applicable (*People v Ray*, 65 NY2d 282, 286 [1985]; *see People v Jones, supra* at 533; *People v Cardona*, 41 NY2d 333, 335 [1977]). As we have previously stated:

> "Relevant indicia of [s]tate involvement, which may transform private conduct into [s]tate action, include: a clear connection between the police and the private investigation; completion of the private act at the instigation of the police; close supervision of the private conduct by the police; and a private act undertaken on behalf of the police to further a police objective" (*People v Greene, supra* at 640-641, quoting *People v Ray, supra* at 286).

Ultimately, however, the question remains whether there was "active governmental participation in a[n] . . . investigation" sufficient to "invoke[ ] the full panoply of constitutional protections" (*People v Ray, supra* at 286; *see People v Velasquez, supra* at 537; *People v Jones, supra* at 533-534).

With these principles in mind, we note that here, the CPS caseworkers, Maloney and McGarry, were members of a countywide, multidisciplinary team comprised of members of the District Attorney's office, police and social service agencies. The

team met regularly and its purpose was "to enhance the prosecutor[ial] process" in criminal proceedings involving child abuse. In furtherance of that purpose, the CPS caseworkers testified that they cooperated with the District Attorney's office by providing information when requested.

With respect to defendant specifically, the CPS caseworkers convened with other members of the team, including an Assistant District Attorney and police investigators, to observe an interview of Peter by the clinical coordinator for the Rensselaer County Department of Social Services on the morning of Luke's death. At that time, the Assistant District Attorney told Maloney, the supervising caseworker, that she would be called to testify at grand jury proceedings. Thereafter, the caseworkers interviewed the children's father and maternal grandparents at the State Police barracks in the Town of Brunswick, Rensselaer County. The caseworkers also spoke to State Police investigators at the barracks about the case.

The following day, on April 17, 2002, and after defendant had been arraigned, the caseworkers interviewed defendant at the Rensselaer County jail, and obtained her authorizations to release medical and psychiatric records, which CPS turned over to the District Attorney's office. After explaining to defendant that they were there to interview her because she was the subject of a hotline report alleging child abuse, the caseworkers questioned defendant for approximately 45 minutes. They obtained a clear and detailed account of the crimes from defendant, including admissions that she knew at the time that she committed the crimes that her actions were wrong. McGarry testified that later on that same day, the caseworkers met with the Assistant District Attorney to discuss the "results of the interview" and progress of the investigation. Maloney also stated that she discussed the contents of the interview with the Assistant District Attorney—who presented the case to a grand jury—on April 18, 2002, immediately prior to testifying before the grand jury regarding defendant's incriminating statements in the interview. In June 2002, after defendant had been indicted, one of the caseworkers returned to the jail, where she interviewed defendant again regarding the crimes and obtained additional releases.

Under these circumstances, we conclude that the caseworkers' conduct was "so pervaded by governmental involvement" that it constituted state action (*People v Ray*, 65 NY2d 282, 286 [1985], *supra*). Despite the CPS caseworkers' insistence that

their investigation was separate, and that their interview of defendant and cooperation with the District Attorney's office were undertaken solely pursuant to the dictates of the Social Services Law and Family Ct Act, we note that no Family Court proceeding was ever initiated or even contemplated as of the date of the interview. Moreover, as noted above, the CPS caseworkers were part of a multidisciplinary team with the common purpose of "enhanc[ing] the prosecutor[ial] process" in criminal proceedings such as this one. While the police and District Attorney may not have expressly requested that the CPS caseworkers interview defendant—a request that was unnecessary in light of the statutory mandates that the interview be performed in any event and that the CPS caseworkers cooperate with the District Attorney's office regarding the case—the supervising caseworker was aware, prior to interviewing defendant in detail about the crimes charged herein, that she would be testifying for the prosecution before a grand jury.

Furthermore, notwithstanding the caseworkers' denial of any understanding that they would communicate incriminating statements obtained from defendant to the prosecution or that they even remained in contact with the prosecution after the interview, the People concede that the caseworkers had a duty to cooperate by sharing information when asked. In this regard, the record demonstrates that McGarry, if not both caseworkers, proceeded to the District Attorney's office on the same day that the interview was performed to relate the contents of the interview, including defendant's admissions. McGarry testified that the purpose of this discussion was to inform the District Attorney about the progress of the case so that he would know of defendant's statements and could request them. In addition, Maloney discussed defendant's incriminating statements with the prosecution the next day, immediately prior to testifying before the grand jury about those very admissions.

Thus, while social workers are generally not considered to be agents of the police (see e.g. Matter of Luis M., 83 NY2d 226, 227 [1994]; People v Batista, 277 AD2d 141, 142-143 [2000], supra; People v Davila, 223 AD2d 722, 723 [1996], lv denied 88 NY2d 846 [1996]), we are satisfied that the CPS caseworkers involved here had a "cooperative working arrangement" with and were acting as agents of the police and prosecutor in interviewing defendant and relaying her incriminating statements (People v Greene, 306 AD2d 639, 641 [2003], supra). Moreover, contrary to the People's assertion that the CPS investiga-

tion remained separate from that performed by the District Attorney's office,

> "the subject of the interrogation and the subject of the criminal charges [were] so inextricably interwoven in terms of both their temporal proximity and factual interrelationship as to render unavoidable the conclusion that any interrogation concerning the [allegations in the hotline report] would almost inevitably involve some potentially incriminating discussion of the facts of the crime itself" (*People v Townes*, 41 NY2d 97, 104 [1976]).

It is therefore immaterial that the CPS caseworkers considered their investigation separate from that of the police and that they did not characterize the police as being in charge of the multidisciplinary team; defendant's "right to counsel cannot hinge on the government's characterization of its own investigation" (*People v Greene, supra* at 641; *see People v West*, 81 NY2d 370, 380 [1993], *supra*).

Nor is it dispositive that the CPS caseworkers interviewed defendant and reported her admissions to the prosecutor pursuant to statutory or regulatory mandate. As we have stated:

> "The regulatory mandate that a CPS caseworker conduct face-to-face interviews with subjects of child abuse reports (18 NYCRR 432.2 [b] [3] [ii] [a]) cannot overcome a subject's constitutional right if the CPS caseworker is an agent for the police at the time of the interview. That mandate can be complied with either by arranging an interview with the subject and counsel or merely completing the information gathering by the CPS caseworker without the ability to use the statement in any criminal proceeding" (*People v Greene, supra* at 641).

Further, it is irrelevant that the caseworkers were unaware of whether defendant had counsel at the time of the interview in light of the conceded knowledge on the part of the police and prosecutor that defendant's right to counsel had indelibly attached (*see People v West, supra* at 379-380). In short, because defendant's admissions to the CPS caseworkers were obtained in violation of her right to counsel, those statements were subject both to preclusion under CPL 710.30 and suppression as

involuntary statements within the meaning of CPL 60.45 (2) (b) (ii).[3]

■ We also agree with defendant that the admission of the statements to the CPS caseworkers on the People's direct case did not constitute harmless error. Inasmuch as we have concluded that the statements were obtained in violation of defendant's constitutional right to counsel, the error can be deemed harmless only if there is no reasonable possibility that the admission of the statements contributed to defendant's conviction (*see People v Sanders*, 56 NY2d 51, 66-67 [1982]; *People v Crimmins*, 36 NY2d 230, 237 [1975]). Here, the parties' experts agreed that defendant suffered from a mental disease or defect at the time that the crimes were committed. In addition, defendant's expert conceded that defendant, at the time of the incident, understood the nature and consequences of her actions. Thus, the only issue concerning defendant's criminal responsibility in this case involved her substantial capacity to know or appreciate that her conduct was wrong, which defendant bore the burden of establishing by a preponderance of the evidence (*see* Penal Law § 40.15; *People v Kohl*, 72 NY2d 191, 193-195 [1988]).

In this regard, defendant relies upon the testimony of Peter regarding his mother's hallucinations of werewolves on the night of the incident, evidence of her reporting numerous hallucinations and delusions during the year prior to the incident, and testimony of a clinical and forensic psychiatrist that due to her paranoid schizophrenia, defendant lacked substantial capacity to appreciate the wrongfulness of her conduct. In response, the People questioned defendant's expert regarding her admissions to the CPS caseworkers that "she knew what she was doing was wrong when she did it," as well as her statements to

---

**3.** In light of our conclusion that defendant's statements were elicited through state interrogation, we need not reach her separate argument that CPL 710.30 notice of the statements was required because the CPS caseworkers were "[p]ublic servant[s]" within the meaning of Penal Law § 10.00 (15) (*see People v Whitmore*, 12 AD3d 845, 847-848 [2004], *lv denied* 4 NY3d 769 [2005]; *see generally People v Miller*, 142 AD2d 760, 761 [1988], *supra*). We note, however, that it is *only* when " 'there is no question of voluntariness' " that the People are not required to provide notice (*People v Chase*, 85 NY2d 493, 500 [1995], *supra* [citation omitted]). When there is any question that the statement may meet the CPL 60.45 definition of involuntariness, a defendant is entitled to notice because "[i]t is for the court and not the parties to determine whether a statement is truly voluntary or is one in which the actions of the police are the functional equivalent of interrogation causing the statement to be made" (*id.* at 500).

the People's forensic psychiatrist during an interview—a videotape of which was introduced into evidence—that she told Luke that she would go to jail for him before killing him, told her parents she would call the police, apologized to Peter after attempting to drown him and resuscitated Luke after nearly drowning him. Ultimately, defendant's expert conceded that she had "some capacity" to know that her conduct, at the time, was wrong. In addition, the People introduced the testimony of their forensic psychiatrist, who could not determine whether defendant lacked substantial capacity to either know or appreciate that her conduct was wrong, stating that he had "opinions about that issue but [he did not] have any opinion on one side of the issue or the other with reasonable medical certainty."

In light of the inability of the People's expert to draw a conclusion with reasonable medical certainty and the strength of defendant's proof regarding her state of mind at the time of the incident, we cannot say that there was no "rational possibility" that the introduction of defendant's statements to the CPS caseworkers on the People's direct case contributed to the conviction (*People v Crimmins, supra* at 242). Accordingly, the error was not "harmless beyond a reasonable doubt" (*id.* at 237). Indeed, we note that prior to County Court's refusal to permit him to testify further on the issue, the People's expert cited defendant's statements to the CPS caseworkers as one of only two factors supporting the conclusion that defendant knew that her conduct was wrong at the time of the incident.[4]

Contrary to the People's argument that defendant's statements would have been admitted on the People's rebuttal case in any event, statements obtained in violation of a defendant's right to counsel are not admissible for the purpose of rebutting a defendant's insanity defense (*see People v Utenyshev*, 264 AD2d 402, 403 [1999], *lv denied* 94 NY2d 799 [1999]; *People v MacKenzie*, 193 AD2d 700, 701 [1993], *lv denied* 82 NY2d 722 [1993]; *see also People v Ricco*, 56 NY2d 320, 327 [1982] [holding same under predecessor statute to Penal Law § 40.15, which made insanity a traditional, rather than an affirmative, defense]). Moreover, while defendant's expert acknowledged defendant's statements to the CPS caseworkers during cross-examination by the People and explained why the statements did not change his opinion regarding her capacity to know that

---

4. The other factor cited was defendant's admission during the expert's interview of her that she told Luke before killing him that she would "go to jail for [him]."

her conduct was wrong, the introduction of the statements for limited purposes during cross-examination cannot be equated with the introduction of the statements as evidence of their truth on the People's direct case. Thus, we would reach the same conclusion even accepting that the statements were admissible once defendant's expert testified that he considered them in evaluating defendant's state of mind, as "matter[s] bearing on [the expert's] competency or credibility or the validity of his diagnosis or opinion" (CPL 60.55 [1]; *see People v Stone*, 35 NY2d 69, 76 [1974]; *People v Brighthart*, 265 AD2d 189, 189 [1999], *lvs denied* 94 NY2d 877, 917 [2000]; *cf. People v Goldstein*, 6 NY3d 119, 126-129 [2005], *cert denied* 547 US —, 126 S Ct 2293 [2006]; *see generally People v Maerling*, 64 NY2d 134, 140 [1984]; *People v Greene*, 306 AD2d 639, 641-642 [2003], *supra*; *People v Robinson*, 205 AD2d 836, 838 [1994], *lv denied* 84 NY2d 831 [1994]). In sum, while we cannot accept defendant's assertion that the People presented *no* evidence that would entitle the jury to reject her affirmative defense of lack of criminal responsibility due to mental disease or defect, we agree with defendant that because the admission of her statements to the CPS caseworkers cannot be considered harmless, reversal and a new trial are required (*see People v Moss*, 179 AD2d 271, 273-275 [1992], *lv dismissed* 80 NY2d 932 [1992]; *People v DeGelleke*, 144 AD2d 978, 980 [1988], *lv denied* 73 NY2d 920 [1989]).

We address defendant's remaining claims to the extent that they are not rendered academic by our determination that we must remit for a new trial. We reject her argument that County Court erred in finding that statements she made to Duket, a police matron, were admissible. Duket was summoned on April 16, 2002 by the Hoosick Falls Chief of Police to supervise defendant while she was in her cell prior to arraignment. At the suppression hearing, Duket testified that after arriving outside defendant's cell, she introduced herself, explained her role and asked whether she could get defendant anything, to which defendant responded that she was hungry and wanted lunch. A police officer present indicated that lunch had been ordered and, thus, Duket did not respond to defendant. Approximately half an hour later, after defendant finished her lunch, she asked Duket for a priest, prompting Duket to reply that arrangements could be made once defendant was transferred to the Rensselaer County jail. Defendant then asked Duket if she believed in God and, after Duket stated that she

did, defendant stood up, leaned on the bars of her cell and asked if Duket knew "what it feels like to kill your child." When Duket stated that she did not, defendant said, "Well, I do." After a few moments had passed without any further conversation, defendant requested a pair of slippers. Duket indicated that this exchange occurred approximately 30 minutes after she began watching defendant and that no other conversation took place. Duket did not report defendant's statements to anyone until after arraignment was complete.

Although it is undisputed that defendant's right to counsel had attached at the time that she made her admissions to Duket, inasmuch as the statements were spontaneous and "not the product of questioning or its functional equivalent," County Court properly determined that the statements were admissible (*People v Smith*, 21 AD3d 587, 588 [2005], *lv denied* 5 NY3d 833 [2005]). Duket's brief interactions with defendant "were not intended or anticipated to evoke inculpatory declarations . . . [and] the police are not required to silence [a] chatterbox" (*People v Taylor*, 1 AD3d 623, 624 [2003], *lv denied* 1 NY3d 602 [2004] [internal quotation marks and citations omitted]; *see People v Sturdivant*, 277 AD2d 607, 608 [2000], *lv denied* 95 NY2d 970 [2000]; *cf. Brewer v Williams*, 430 US 387 [1977]). Moreover, although defendant argues that the statements should have been suppressed because her arraignment was unnecessarily delayed, we note that an unwarranted period of pre-arraignment delay is only one factor to be considered in assessing whether a confession or admission was voluntary (*see People v Ramos*, 99 NY2d 27, 34 [2002]; *People v Holland*, 48 NY2d 861, 862-863 [1979]). Inasmuch as there is no indication here that arraignment was delayed for the purpose of obtaining a confession—indeed, defendant had already admitted to the 911 operator and Silvestro that she killed Luke—or that defendant's statements were elicited through interrogation, however subtle, by agents of the state, we conclude that the People demonstrated beyond a reasonable doubt that "the totality of the circumstances shows that [her] statements were voluntarily made" (*People v Sears*, 9 AD3d 472, 472 [2004], *lv denied* 3 NY3d 711 [2004]; *cf. People v Holland, supra* at 863; *see also People v Velasquez*, 68 NY2d 533, 537 [1986], *supra*).

■ Similarly unpersuasive is defendant's argument that the prosecutor was a necessary witness and, therefore, should have been disqualified. This argument arises from defendant's contention that the prosecutor's testimony was necessary to

determine whether defendant was subject to interrogation prior to Duket's arrival, thereby rendering her statements to Duket involuntary. At the suppression hearing, however, the prosecutor testified that the extent of her interaction with defendant before Duket's arrival was limited to observing defendant, who was on active supervision, use the bathroom for approximately two minutes, during which time she did not engage defendant in conversation and spoke only to apologize for her presence during an awkward moment. Contrary to defendant's argument, the prosecutor's testimony was not inconsistent with Duket's statement that she observed the prosecutor in the vicinity of defendant's cell "for a moment" upon her arrival at the jail. In light of defendant's failure to establish that the prosecutor would give testimony adverse to the People if called by the defense or that there was a significant possibility that her testimony was necessary or relevant to a material issue at trial, we agree with the People that disqualification was not required here (*see People v Paperno*, 54 NY2d 294, 300-303 [1981]; *People v Somerville [Aponte]*, 249 AD2d 687, 690 [1998], *lvs denied* 92 NY2d 922, 931 [1998]; *People v Williams*, 231 AD2d 751, 751-752 [1996], *lv denied* 88 NY2d 1072 [1996]).

Finally, we need not resolve defendant's arguments relating to prosecutorial misconduct in light of our determination that a new trial is required for other reasons. We note, however, that the majority of the remarks challenged on appeal were made on summation and, in our view, were within the "broad latitude" permitted to the prosecutor in responding to defense counsel's summation (*People v D'Alessandro*, 184 AD2d 114, 119 [1992], *lv denied* 81 NY2d 884 [1993]). Nevertheless, in light of our remittal for a new trial, we emphasize that, unlike defense counsel, a "public prosecutor is a 'quasi-judicial officer, representing the People of the state, and presumed to act impartially in the interest only of justice' " (*People v Collins*, 12 AD3d 33, 36 [2004], quoting *People v Fielding*, 158 NY 542, 547 [1899]). Thus, "[w]hile prosecutors have wide berth to advocate for their case, there are limitations. . . . [P]rosecutors 'should not seek to lead the jury away from the issues by drawing irrelevant and inflammatory conclusions which have a decided tendency to prejudice the jury against the defendant' " (*People v Harris*, 98 NY2d 452, 492 n 18 [2002], quoting *People v Ashwal*, 39 NY2d 105, 110 [1976]). In addition, prosecutors " 'may not refer to matters not in evidence or call upon the jury to draw conclusions which are not fairly inferrable from the evidence' "

(*People v Gorghan*, 13 AD3d 908, 909 [2004], *lv dismissed* 4 NY3d 798 [2005], quoting *People v Ashwal, supra* at 109-110), vouch for the credibility of the People's witnesses, denigrate an affirmative defense or imply that a defendant's pretrial silence or invocation of the right to counsel is evidence of guilt (*see People v Collins, supra* at 38; *People v Dworakowski*, 208 AD2d 1129, 1130 [1994], *lv denied* 84 NY2d 1031 [1995]). We caution the People to abide by these well-settled principles upon retrial.

CREW III, MUGGLIN, ROSE and KANE, JJ., concur.

Ordered that the judgment is reversed, on the law, and matter remitted to the County Court of Rensselaer County for a new trial.