People v Lewis (2018 NY Slip Op 07980)





People v Lewis


2018 NY Slip Op 07980


Decided on November 21, 2018


Appellate Division, Third Department


McCarthy, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 21, 2018

109259

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
QUENTIN J. LEWIS, Appellant.

Calendar Date: October 17, 2018

Before: Garry, P.J., McCarthy, Lynch, Aarons and Rumsey, JJ.


Andrea G. Hirsch, New York City, for appellant.
Joseph Stanzione, District Attorney, Catskill (Danielle D. McIntosh of counsel), for respondent.



OPINION AND ORDER
McCarthy, J.
Appeal, by permission, from an order of the County Court of Greene County (Koweek, J.), entered October 25, 2016, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment convicting him of the crime of manslaughter in the first degree, after a hearing.
In 2001, defendant was convicted of manslaughter in the first degree in relation to the stabbing death of a fellow inmate at a state correctional facility and was sentenced, as a second felony offender, to a prison term of 25 years. This Court affirmed (300 AD2d 827, 828 [2002], lv denied 99 NY2d 630 [2003]). In 2012, defendant moved, pursuant to CPL 440.10, to vacate the judgment of conviction, alleging that the People violated their obligation under Brady v Maryland (373 US 83 [1963]) by failing to disclose that fellow inmates had been coerced into making statements. One such inmate, Miguel Roman, averred in an affidavit submitted in support of defendant's motion that, on the night of the stabbing incident, he was taken to see "the Investigator General," and, after he denied seeing anything, prison staff threatened him to make him cooperate in the investigation (125 AD3d 1109, 1111 [2015]). Roman specifically alleged that correction officers had found marihuana in his belongings and threatened to charge him with drug possession, send him to solitary confinement and cut off his correspondence privileges with his wife, who was also an inmate at the time (id.). He further averred that when he refused to [*2]testify in front of the grand jury, he was threatened with drug charges and perjury; he then testified.
County Court (Pulver Jr., J.) denied defendant's motion without a hearing. On appeal, this Court reversed and remitted the matter for further proceedings, finding that a hearing was needed, particularly on the issue of whether the People had a duty to learn of the alleged coercion and, accordingly, whether they were responsible for failing to disclose it (id. at 1110-1113). Following a hearing on remittal, County Court (Koweek, J.) determined that Roman was allegedly threatened by prison officials, as opposed to law enforcement officers affiliated with an outside police agency, and, as such, the People were not obliged to disclose any evidence within the knowledge of those officials. Based on those findings, the court denied defendant's motion. With this Court's permission, defendant now appeals.
To prevail on this motion to vacate his judgment of conviction, defendant bore the burden of proving by a preponderance of the evidence that his conviction was obtained in violation of his constitutional rights (see CPL 440.10 [1] [h]; 440.30 [6]). As limited by the allegations in his motion, defendant had to prove that the People committed a Brady violation by showing "that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (People v Fuentes, 12 NY3d 259, 263 [2009]; see People v Serrano, 99 AD3d 1105, 1106 [2012], lv denied 20 NY3d 1014 [2013]). The hearing focused on the second element. Although the People conceded that they did not disclose to defendant prior to trial that anyone threatened or promised anything to Roman, the question distilled to whether the People had a duty to learn of any such conduct and could be held to have suppressed knowledge of it.
Due process requires prosecutors to disclose to the defense favorable information in their possession or control, which includes "a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police" (Kyles v Whitley, 514 US 419, 437 [1995]; accord People v Santorelli, 95 NY2d 412, 421 [2000]; see People v Garrett, 23 NY3d 878, 886-887 [2014]). Several cases have held that "[e]vidence gathered by prison staff . . . generally is not 'under the control or in the possession of the People or its agents, but [is] instead in the possession of an administrative agency that was not performing law enforcement functions'" (125 AD3d at 1111, quoting People v Smith, 89 AD3d 1148, 1150 [2011], lv denied 19 NY3d 968 [2012]; see People v Howard, 87 NY2d 940, 941 [1996]; People v Lanfranco, 124 AD3d 1144, 1145-1146 [2015], lv denied 25 NY3d 1203 [2015]; People v Figueroa, 53 AD3d 779, 781 [2008], lv denied 11 NY3d 832 [2008]; People v Ross, 282 AD2d 929, 931 [2001], lv denied 96 NY2d 907 [2001]). That said, whether knowledge of a government official or employee may be imputed to the People appears to turn on whether participation in the criminal probe was an ancillary law enforcement task (see People v Kelly, 88 NY2d 248, 253 [1988]) or whether the level of cooperation between the employee and law enforcement in a particular criminal investigation renders the employee an agent of the People (see People v Garrett, 23 NY3d at 887; People v Santorelli, 95 NY2d at 421; see also Tiscareno v Anderson, 639 F3d 1016, 1021-1022 [10th Cir 2011]). Under agency principles, "acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals" (Kirschner v KPMG, 15 NY3d 446, 465 [2010]). For example, "[w]hile social workers are generally not agents of the police," in situations where they engage in a "joint venture" with police agencies to collaborate on child abuse or sexual abuse investigations, share information and a common purpose, and have a "cooperative working [*3]arrangement" with police, an agency relationship may exist such that the social workers' knowledge is imputed to the People (People v Greene, 306 AD2d 639, 641 [2003], lv denied 100 NY2d 594 [2003]; see People v Wilhelm, 34 AD3d 40, 48 [2006]).
Although the State Police was the lead agency investigating this homicide, defendant does not assert that any State Police investigator was aware of the alleged coercion. Defendant infers that the person who Roman averred was present for the coercion — a person Roman called "the Investigator General," a title that does not exist — must have been the lead investigator from the Department of Correctional Services (hereinafter DOCS) Office of the Inspector General (hereinafter the IG)[FN1]. Roman did not testify at the hearing, however, and the identity of that person was never established. We cannot rely on mere inferences to identify him. As noted by County Court, it is difficult to determine whether a person was acting as an agent of the police when we do not know that person's identity or, concomitantly, his exact role in the investigation.
Defendant relied on several documents discussing DOCS's policy to show, in general, that the IG and its investigators are part of law enforcement. Directive No. 6910 — the only document submitted by defendant that was in force during the relevant time [FN2] — was created to provide "a coordinated approach to criminal prosecution of inmates and visitors who commit penal law violations . . . with the objective of maintaining a safe working and living environment and curtailing violence." The directive created new procedures for DOCS employees who are on the scene of a crime at a prison to ensure that any evidence or materials pertinent to the case are preserved. This was in addition to establishing and strengthening the working relationship between DOCS staff and law enforcement personnel "to more fully support their investigative and prosecutorial functions." Although this policy directive provided new procedures that would preserve materials and information for criminal prosecution and facilitate getting them into the hands of police and prosecutors, DOCS employees had previously been conducting investigations and collecting evidence for administrative reasons, including prison disciplinary proceedings. The new policy built on the collection of such evidence for those administrative proceedings to ensure that it is handled and processed in ways that will support its admissibility in court. Criminal prosecutions may be enhanced under the directive, but the main purposes behind it were to curb prison violence and preserve order within prison facilities.
The only witness at the hearing was Mark Miller, who was an IG investigator in 2000 and, at the time of the hearing, was deputy chief of investigations for its successor office. He testified that the IG primarily conducted internal administrative investigations because it was not a criminal investigation unit. Accordingly, the IG would not actually investigate a homicide, and its primary purpose following a suicide or homicide was to respond to the incident and assist the State Police. Defendant emphasizes the word "assist" to argue that the IG investigators were agents of the State Police. We do not rest on a single word but must look at the overall involvement of the individual who is alleged to be an agent of the police.
On the night of the stabbing, Miller responded to the facility and, though he does not remember doing any interviews, it was brought to his attention that he sat in a room while a State Police investigator interviewed an inmate (not defendant or Roman). He explained that having an IG investigator in the room may be helpful because an IG investigator is knowledgeable about prisons and their operations, and inmates may feel more comfortable with such an investigator present rather than being alone with the State Police, who are criminal investigators. Miller testified that he was able to assist the State Police by looking in the DOCS computer databases to provide information such as where inmates were assigned; State Police would otherwise not have access to such databases. Due to the inherent nature of prisons, the State Police could not conduct any sort of investigation in a DOCS facility without assistance from DOCS staff, including being granted access to any room, record or inmate. According to Miller, the main goal of the IG in such situations was the safety and security of the facility and its inmates. After a homicide in a dorm, the IG needed to investigate for administrative reasons such as to determine who was directly responsible, if others were involved, the motive for the incident and whether it was gang-related, so that the IG would know whether retaliation was likely and if certain inmates needed to be separated or removed for safety purposes and to maintain order in the facility. Miller specifically testified that this was not a joint investigation with the State Police.
Courts need not accept a person's characterization of his or her involvement or investigation (see People v Wilhelm, 34 AD3d at 49; People v Greene, 306 AD2d at 641). Nevertheless, rather than a single, common investigation, it appears that the State Police and IG were conducting parallel investigations — one criminal and one administrative, albeit with some obvious and necessary overlap — addressing different aspects of the situation (cf. People v Santorelli, 95 NY2d at 421-422; compare People v Wilhelm, 34 AD3d at 48; People v Greene, 306 AD2d at 641). The report from the lead IG investigator — who was not called to testify — reveals that he interviewed inmates with the State Police, gathered information for two months after the incident, conferred with State Police and met with the District Attorney. But the report indicates that the IG closed its case six months before defendant's criminal trial, based on a finding that there was no evidence of staff misconduct, indicating the administrative focus of the IG's investigation.
The record contains some evidence that would support a conclusion that the IG investigators were agents of the police, but other evidence that would support a contrary conclusion. Defendant attempts to fill in the gaps and tip the balance by relying on supposition and inferences. Considering the conflicting evidence, defendant did not meet his burden of proving, by a preponderance of the evidence (see CPL 440.30 [6]), that the IG investigators were working as an arm of law enforcement on the night of the incident, so as to impute to the People any knowledge of an IG investigator that Roman may have been threatened or coerced. As defendant did not prove that the People committed a Brady violation (People v Lanfranco, 124 AD3d at 1145-1146; People v Ross, 282 AD2d at 931), County Court correctly denied his CPL 440.10 motion.
Garry, P.J., Lynch, Aarons and Rumsey, JJ., concur.
ORDERED that the order is affirmed.



Footnotes

Footnote 1: The former DOCS is now part of the Department of Corrections and Community Supervision. Its former Inspector General's office is now called the Office of Special Investigations.

Footnote 2: Like County Court, we question the relevancy of documents published after 2000, the year in which this incident and investigation occurred.