People v Nellis (2023 NY Slip Op 03046)

People v Nellis

2023 NY Slip Op 03046

Decided on June 8, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 8, 2023

112665 113346
[*1]The People of the State of New York, Respondent,
v
Daniel A. Nellis Sr., Appellant.

Calendar Date:May 3, 2023

Before:Lynch, J.P., Clark, Pritzker and Ceresia, JJ. 

Law Office of Steven M. Sharp, Albany (Steven M. Sharp of counsel), for appellant.
Michael J. Poulin, District Attorney, Johnstown (Amanda M. Nellis of counsel), for respondent.

Ceresia, J.
Appeals (1) from a judgment of the County Court of Fulton County (Polly A. Hoye, J.), rendered August 22, 2019, upon a verdict convicting defendant of the crimes of murder in the second degree, criminal possession of a weapon in the third degree (two counts) and criminal possession of a weapon in the first degree, and (2) by permission, from an order of said court (Guy P. Tomlinson, J.), entered March 21, 2022, which denied defendant's motion pursuant to CPL 440.10 to vacate the judgment of conviction, without a hearing.
Shortly after midnight on September 25, 2018, the victim finished her shift at the Stewart's Shop on Main Street in the Village of St. Johnsville, Montgomery County. She left the store on foot and headed in the direction of her residence, which was a short distance away, but never made it home and was later reported missing. During the ensuing investigation, it was discovered that the last outgoing call from the victim's phone had been made to defendant's phone. Defendant was questioned by the police but denied any involvement in her disappearance. A few days later, as part of the investigation, the police discovered over 100 guns in a vacant apartment, and defendant was arrested for unlawfully possessing a number of them. On October 2, 2018, a landowner in nearby Fulton County was traversing his property when he saw what appeared to be drag marks on the ground, followed them and discovered the victim's body in the underbrush. The victim's pants were pulled down and she had been shot in the head at close range. Six weeks later, defendant was charged by indictment with murder in the second degree (see Penal Law § 125.25 [1]), two counts of criminal possession of a weapon in the third degree (see Penal Law §§ 265.01 [1], [2]; 265.02 [1]) and criminal possession of a weapon in the first degree (see Penal Law § 265.04 [2]).
After a lengthy jury trial, defendant was convicted as charged. County Court (Hoye, J.) sentenced defendant to 25 years to life in prison for his conviction of murder in the second degree, lesser concurrent prison terms for his convictions of criminal possession of a weapon in the third degree, and a consecutive term of 15 years in prison plus 5 years of postrelease supervision for his conviction of criminal possession of a weapon in the first degree. Defendant subsequently filed a motion pursuant to CPL article 440 to vacate his convictions based on newly discovered evidence and ineffective assistance of counsel, which County Court (Tomlinson, J.) denied without a hearing. Defendant appeals from the judgment of conviction and, by permission, from the denial of his CPL article 440 motion.
Initially, defendant contends that the convictions of murder in the second degree and criminal possession of a weapon in the first degree are based upon legally insufficient evidence and are against the weight of the evidence.[FN1] As defendant concedes, he did not preserve his legal sufficiency challenge. "Nevertheless, a weight [*2]of the evidence challenge, which bears no preservation requirement, also requires consideration of the adequacy of the evidence as to each element of the crimes" (People v Truitt, 213 AD3d 1145, 1146 [3d Dept 2023] [internal quotation marks and citations omitted], lv denied 39 NY3d 1144 [2023]; see People v Ashe, 208 AD3d 1500, 1501 [3d Dept 2022], lv denied 39 NY3d 961 [2022]). "In conducting a weight of the evidence review, we must view the evidence in a neutral light and determine first whether a different verdict would have been unreasonable and, if not, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony" (People v Montford, 207 AD3d 811, 812 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 39 NY3d 941 [2022]; see People v Sostre, 172 AD3d 1623, 1625 [3d Dept 2019], lv denied 34 NY3d 938 [2019]). As relevant in this case, "[a] person is guilty of murder in the second degree when[,] . . . [w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law § 125.25 [1]). In addition, "[a] person is guilty of criminal possession of a weapon in the first degree when such person . . . possesses [10] or more firearms" (Penal Law § 265.04 [2]).
At trial, the People relied upon video surveillance, cell phone records and witness testimony to establish a timeline of events. The evidence showed that defendant and the victim arrived at defendant's residence at approximately 12:45 a.m. on September 25, 2018 and then left together around noon that day. Shortly before 12:30 p.m., a car resembling defendant's was seen on surveillance video traveling in the direction of the location where the victim's body was eventually found, and defendant's cell phone was tracked to that area. About five minutes later, the same surveillance camera recorded what appeared to be defendant's vehicle driving in the opposite direction. Within that time frame, the victim's Fitbit recorded her heart rate rapidly rising to a peak of 180 beats per minute, and then dropping so low that the device stopped recording. A few hours later, defendant was seen on camera returning to his residence holding an item that seemed consistent with the victim's distinctive handbag, which she had been carrying the night before and was never recovered. Days afterward, a police investigator observed that defendant had scratches on his arms and back. When the victim's body was discovered a week after she disappeared, defendant's DNA was found on her clothing, body and under her fingernails, with some of that DNA deriving from defendant's sperm. For his part, defendant admitted during his trial testimony that he and the victim were together during the night and following morning in question, and claimed that they had consensual sex. Defendant further stated that he fired a gun during that period of time as a warning shot to what he thought were [*3]possible intruders. However, defendant denied killing the victim, testifying that they were out driving together when the victim stated that she wanted to get out of his car and proceeded to walk away, after which he never saw her again.
As for the guns found in the vacant apartment, which was on the upper floor of a two-story building, there was witness testimony that defendant essentially acted as the building's caretaker, that he had previously lived in the second-floor apartment, that he still had access to that apartment and that he had spoken of keeping guns there. Defendant's cell phone was tracked to the area of that building on the afternoon of September 25, 2018 and on multiple occasions over the next few days. Of the more than 30 handguns that were found inside the apartment, none were registered to defendant, and 11 were test fired and determined to be operable. In his testimony, defendant denied that he had keys to the padlocks on the doors of the apartment, denied that the guns were his and claimed that they belonged to the building's owner.
With respect to the weight of the evidence, a different verdict would not have been unreasonable, in light of the circumstantial nature of the case, the fact that no murder weapon was found and defendant's testimony denying culpability. However, deferring to the jury's credibility determinations and viewing the evidence in a neutral light, we find that the weight of the evidence supports the verdict in all respects (see People v Truitt, 213 AD3d at 1149; People v Meadows, 183 AD3d 1016, 1019-1020 [3d Dept 2020], lv denied 35 NY3d 1047 [2020]; People v Slocum, 178 AD3d 1131, 1134 [3d Dept 2019], lv denied 35 NY3d 944 [2020]). As for the murder conviction, there was proof that put defendant and the victim together at the relevant time and demonstrated that the two of them traveled toward the area where the victim's body was ultimately found. During that time, according to the evidence, the victim's heart rate increased to a very high level before dropping off. The evidence also indicated that defendant had access to guns. The proof further showed the presence of defendant's DNA under the victim's fingernails, which was consistent with defendant having scratches on his body, suggesting a struggle. Turning to the weapons possession charge, there was proof that defendant constructively possessed 11 firearms — all established to be operable — due to his control over the vacant apartment (see People v Primakov, 105 AD3d 1397, 1398 [4th Dept 2013], lv denied 21 NY3d 1045 [2013]; see also People v McCoy, 169 AD3d 1260, 1264 [3d Dept 2019], lv denied 33 NY3d 1033 [2019]). Defendant's contention regarding the purported antique nature of some of the subject handguns is unavailing.
Nevertheless, in light of multiple instances of prosecutorial misconduct, in response to which County Court (Hoye, J.) failed to intervene, we are compelled to reverse defendant's conviction and order a new trial. Generally, "[*4]reversal based on prosecutorial misconduct is warranted if the misconduct is such that the defendant suffered substantial prejudice, resulting in a denial of due process" (People v Almenteros, 214 AD3d 1027, 1030 [3d Dept 2023] [internal quotation marks, brackets and citations omitted]; see People v Green, 208 AD3d 1539, 1546 [3d Dept 2022]). Importantly, "[t]hat determination hinges upon the severity and frequency of the conduct, whether the trial court took appropriate action to dilute the effect of the conduct and whether, from a review of the evidence, it can be said that the result would have been the same absent such conduct" (People v Gertz, 204 AD3d 1166, 1171 [3d Dept 2022] [internal quotation marks and citations omitted], lv denied 38 NY3d 1070 [2022]).
Prior to trial, the People made a combined Sandoval/Molineux motion in which they detailed numerous prior convictions and other bad acts committed by defendant. The People sought authority to introduce such evidence on their case-in-chief, as well as to use it on cross-examination in the event that defendant chose to testify. Defendant opposed the application in total. County Court ruled that the People could introduce evidence of one bad act on their case-in-chief and could cross-examine defendant in connection with three of his prior convictions.
During their direct case, however, the People elicited testimony from three different witnesses about a prior bad act that had not been included in their Sandoval/Molineux proffer. As a result, the People made no showing of the materiality and probative value, if any, of such evidence, and at the same time denied opportunities for defendant to be heard in connection therewith and County Court to make an advance evidentiary ruling (see People v Ventimiglia, 52 NY2d 350, 362 [1981]; People v Nicholas, 130 AD3d 1314, 1317 [3d Dept 2015]; People v Wlasiuk, 32 AD3d 674, 678 [3d Dept 2006], lv dismissed 7 NY3d 871 [2006]). These witnesses testified that they spoke to defendant on September 25, 2018 or within days afterward, and that he volunteered to each of them that he had shot someone off a motorcycle. Recognizing that defendant was on trial for allegedly shooting the victim, this bad act evidence was particularly damning and indeed gave rise to a significant risk that the jury would view it as evidence of defendant's criminal propensity, particularly in the absence of any limiting instruction. The possibility of such prejudice "may have been further exacerbated by the repeated presentation of [this] prior bad act evidence through multiple witnesses" (People v Wlasiuk, 32 AD3d at 678).
Next, while cross-examining defendant, the prosecutor questioned him about one of the prior convictions that County Court had permitted in its Sandoval ruling — attempted reckless endangerment in the second degree. The prosecutor asked defendant whether the incident, which had occurred approximately a decade earlier, involved him shooting a rifle toward another [*5]person. Defendant denied this, and he was then questioned as to whether he tried to reload the rifle but was stopped by bystanders, which he also denied. The prosecutor then asked, "is that how you handle your confrontations, you grab a gun and just fire away?" The prosecutor continued the questioning in this vein by asking defendant whether it was "[k]ind of like . . . on the morning of September 25, 2018, [when] you just fired a warning shot out the window, correct?" The prosecutor subsequently cross-examined defendant relative to the incident involving him shooting someone off a motorcycle — which, as noted above, was not included in the People's Sandoval/Molineux motion. In a separate line of questioning, the prosecutor asked defendant about another situation that the People had failed to include as part of their pretrial motion. Specifically, the prosecutor inquired as to whether defendant had stated in a recorded jail call that another inmate had urinated in his bed and that, if he caught who did it, he would stab that person in the neck with a pencil. Later, the prosecutor asked defendant, "you have a bit of a short fuse, don't you?" When defendant responded, "[n]ot really," the prosecutor then followed up with, "[w]ell, you'll shoot a gun during an argument, you would threaten to stab someone in the neck with a pencil because they wronged you, won't you?" The above-referenced questions by the prosecutor — some of which focused on matters outside of County Court's Sandoval/Molineux ruling — were plainly improper, bearing, as they did, not upon defendant's credibility or veracity but upon his criminal propensity (see People v Sandoval, 34 NY2d 371, 375-377 [1974]; People v Anderson, 83 AD3d 854, 855-856 [2d Dept 2011]). Said another way, the prosecutor, through his questioning, did not merely attempt to impeach defendant's testimony, but instead sought to create the impression that defendant had a propensity for acting violently when angry.
It bears further mentioning that compounding the magnitude of the prosecutor's misconduct was the fact that County Court made no effort to intervene or otherwise attempt to minimize or alleviate the prejudice being caused to defendant. To be sure, a trial court should tread carefully and exercise a reasonable degree of restraint before interjecting in the proceedings, given that there might be strategic reasons not readily apparent to the court as to why a defendant's attorney would allow what may seem to be questionable evidence to come in unchallenged. Clearly, however, such is not the case here. County Court certainly must have been aware that some of the evidence introduced by the prosecutor, both on the People's direct case and upon cross-examination of defendant, fell outside the scope of the court's pretrial evidentiary rulings. Additionally, County Court should have been aware of the inappropriate propensity use of the evidence being undertaken by the prosecutor. Despite this, no corrective actions[*6]— including, for instance, striking the testimony and/or giving proper cautionary instructions — were provided by the court (see People v Nicholas, 130 AD3d at 1317; People v Lindsey, 75 AD3d 906, 908 [3d Dept 2010], lv denied 15 NY3d 922 [2010]; People v Westerling, 48 AD3d 965, 968 [3d Dept 2008]).
The prejudice that resulted from the aforementioned evidence and questioning concerning defendant's purported propensity for violence cannot be overstated, as there was no proof at trial of defendant's motive to commit murder. Indeed, this point was driven home at several points during the prosecutor's summation, such as when he remarked, "maybe [the defendant is] manipulative. That's the type of person who might just kill someone, and they may appear to do it for no reason." The prosecutor also told the jury that it was not their job "to make sense out of a senseless act," and that "bad things happen in life . . . and no matter how hard we try, we're unable to get answers, or good answers, about why they occur." Later, when referring to defendant being seen buying coffee shortly after allegedly committing the murder, the prosecutor commented, "[t]here's a name for people who act like that, ladies and gentlemen. Those people with that kind of a title, they don't need motives." In short, faced with a brutally violent crime with no apparent motive, the jury was given the highly prejudicial impression that defendant acted in the manner that he did because he was hotheaded and prone to violence.
In addition to the foregoing, we note that the prosecutor made multiple improper comments during summation. Such statements, which in our view strayed beyond the bounds of fair comment during summation, included denigrating the defense [FN2] as well as arguably shifting the burden of proof to defendant (see People v King, 115 AD3d 873, 875 [2d Dept 2014]; People v Wilhelm, 34 AD3d 40, 54-55 [3d Dept 2006]; People v Brown, 26 AD3d 392, 393 [2d Dept 2006]).
Accordingly, for all of the reasons articulated above, we conclude that the misconduct of the prosecutor, as exacerbated by County Court's inaction, caused defendant to suffer substantial prejudice, the result of which was the deprivation of due process (see People v Jones, 134 AD3d 1588, 1589 [4th Dept 2015]; People v De Vito, 21 AD3d 696, 699-700 [3d Dept 2005]). In making our ruling herein, we are mindful that no defense objections were lodged to a number of the most serious errors, rendering them unpreserved for review; nevertheless, under these circumstances and given the magnitude and frequency of the errors, we find it appropriate to address them in the interest of justice (see CPL 470.15 [6] [a]; People v Porter, 136 AD3d 1344, 1346 [4th Dept 2016]). Defendant's remaining contentions have been rendered academic.
Lynch, J.P., Clark and Pritzker, JJ., concur.
ORDERED that the judgment is reversed, on the law, and matter remitted to the County Court of Fulton County for further proceedings not inconsistent [*7]with this Court's decision.
ORDERED that the appeal from the order is dismissed, as academic.

Footnotes

Footnote 1: Defendant raises no such argument with respect to the two counts of criminal possession of a weapon in the third degree.

Footnote 2: By way of example, at one point the prosecutor made the inflammatory comment that "the devil is in the details. I'm sorry, Daniel Nellis is in the details."